CASE 18—PETITION ORDINARY—MAY 28.

# Smith v. Western Union Telegraph Co.

### APPEAL FROM HENRY CIRCUIT COURT.

1. TELEGRAPH COMPANIES can not, by contract, relieve themselves from liability for their *negligence* in failing to deliver messages.
2. DAMAGES—FAILURE TO DELIVER TELEGRAM.—The damages which may be recovered for the breach of a contract are such only as the parties may fairly be *supposed* to have considered, or at least would have considered as flowing from a breach of the contract if they had been informed of all the facts.

   Appellant made a deposit with stock-brokers in the city of New York to secure them in whatever sum they might expend for stocks which they were authorized to purchase for him. They were not to sell the stock purchased, except in the event it so declined in value that its value, with the deposit made by appellant, did not equal the amount paid therefor. A half-rate telegram was addressed to appellant at Eminence, Kentucky, by his agents, notifying him of a purchase of stocks, several purchases having previously been made for him, of which he had notice. The telegram was received by the operator at Eminence, but never delivered. Appellant's stocks declining so that their value, together with his deposit, was less than the amount paid for them, appellant's agents sold. Soon thereafter there was a reaction and the stocks increased very much in value. In this action against the telegraph company the jury find that if appellant had received the telegram he would have ordered his stock, or a part of it, sold when stocks first began to decline, of which he had notice, and thus have saved $5,800 of his deposit.

   *Held*—That the consequences which resulted to appellant were not the ordinary result of the failure to deliver the message, and, hence, can not be supposed to have been contemplated when the company undertook to transmit it; and that the appellant can, therefore, recover only the cost of the message.
3. SPECIAL VERDICTS.—What a person *might* or *would* have done in a certain event is not the proper subject of a special finding, and such a finding, although not objected to, will not be considered.

W. LINDSAY FOR APPELLANT.

1. A telegraph company can not restrict its liability for loss resulting from its *negligence* in failing to deliver messages. (Camp v. Western Union Telegraph Co., 1 Met., 164; U. S. Telegraph Co. v.

Wenger, 55 Pa. St., 262; U. S. Telegraph Co. v. Gildersleeve, 29· Md., 232; Ritterhouse v. M. L. of Lee, 44 N. Y., 263; Thompson on Negligence, volume 2, page 857; Sherman & Redfield on Negligence (3d ed.), section 571; Griswold v. Dunham, 12 Reporter, page 25; General Statutes, chapter 29, article 14, section 10.)

2. In cases of injury to or loss of *existing* property owned by the plaintiff, the damages can be ascertained with reasonable accuracy, and the question in such cases is, whether they arise out of the breach of contract, and are to be reasonably traced to it, as the moving cause. The doctrine of Hadley v. Baxendale, 9 Exch., 341, does not apply to such cases, although often so misapplied. (Wilson v. Newport Dock Company, C. L. Reports, 1 Ex., 188.)

3. It is to be assumed that appellant's agents would have obeyed an order to sell. (U. S. Tel. Co. v. Wenger, 55 Pa. St., 262; Tyler· v. W. U. Tel. Co., 60 Ill., 421; W. U. Tel. Co. v. Bertram, Re-· porter, volume 12, page 798; Ritterhouse v. Tel. Co., 44 N. Y., 263.) And it may also be assumed that appellant would have· ordered a sale if he had received the telegram; but if not, that was a question of fact for the jury, and its finding is conclusive.. (Denny v. Flitner, 118 Mass., 131; Goodloe v. Rodgers, 10 La. Ann., 631; Calvin v. McFadden. 13 Dr., 324; 31 Vt., 540; Dewitt. v. Wietre, 9 Wend., 325; Davis v. Garrett, 6 Bing., 716.)

4. Orders to agents to buy or sell stock impart sufficient information· of their importance to render the telegraph company liable for the consequence of its neglect in their transmission or delivery.. (U. S. Tel. Co. v. Wenger, 55 Pa. St., 262; Tyler v. W. U. Tel.. Co., 60 Ill., 421; Ritterhouse v. Tel. Co., 44 N. Y., 263.)

5. In case of a breach of contract, the party in default, having notice· of the importance in general of the prompt performance of contracts of like nature, is to be taken to have contemplated all the: consequences that would reasonably have been apparent to him,.. if he had known all the· facts which he might have learned, by inquiry made at the time, of the person with whom he negotiated. the agreement. (Leonard v. N. Y. Tel. Co., 41 N. Y., 54; West. Un. Tel. Co. v. Bertram, 12 Reporter, page 798.) In petition for rehearing counsel upon this point cited also: Sutherland on Damages, volume 3, page 311; Carroll v. W. U. Tel. Co., 34 Wis., 471.)

6. As to what appellant *might* or *would* have done being a question of fact for the jury. counsel cited in petition for rehearing: E. & P. R. R. Co. v. Pottinger & Bro., 10 Bush, 185; U. S. v. Behan, 110· U. S., 338.

HARGIS & CALDWELL ON SAME SIDE.

1. The measure of damages for breach of contract is such as may,. fairly and substantially, be considered as arising naturally from the breach, or for whatever damages may fairly be supposed .to·

have been within the contemplation of the parties, had they known at the time of the contract the facts affecting it which subsequently transpired. (Gee v. Lancashire and Yorkshire Railway, 6 H. & N., 210; Griffin v. Colver, 16 N. Y., 489; Jones and Jarnagan on Law of Telegraphs, section 390, page 390; Sedgwick on Damages, page 77; Redfield on Carriers, chapter: "Telegraph Companies.")

2. The jury have ascertained the damages, which are such as the parties ought reasonably to have expected would flow from the failure to deliver the dispatch when the company agreed to deliver it.

CARROLL & BARBOUR for appellee.

What appellant would have done had he received the telegram is mere conjecture, and, therefore, the damages claimed for the failure to deliver it are too remote and uncertain to be the subject of recovery. A party who has failed to fulfill a contract can not be held liable for such remote, contingent and uncertain consequences. (Landsberger v. Magnetic Telegraph Co., Allen's Telegraph Cases, 165; Squire v. W. U. Tel. Co., Ibid., 377; Shields v. Washington Tel. Co., Ibid., 5; Lane v. Montreal Tel. Co., Ibid., 64; Stevenson v. Montreal Tel. Co., Ibid., 83; U. S. Tel. Co., Ibid., 390; Baldwin v. U. S. Tel. Co., Ibid., 614; McCall v. Tel. Co., Abbott's New Cases, 151; Lowery v. Tel. Co., 60 N. Y., 198.)

JUDGE HOLT delivered the opinion of the court.

About November 14, 1879, the appellant, Z. F. Smith, employed Manuel & Co., who were stock-brokers in the city of New York, to purchase stocks for him for speculation. To secure them in whatever sum they might thus expend, he deposited with them, in cash and bonds, about $17,000. They had a general discretionary power from him to purchase, save they were not to buy more than seventeen hundred shares, and were not to sell it except upon his order, or in the event the stock they might purchase so declined in value that it, with the money deposited with them by the appellant, did not equal the amount paid by them for the stock. Prior to November 18, 1879, they had purchased for him eleven hundred shares of railway

stocks, but had not notified him of the purchase of the last four hundred of them. Upon the last-named day they bought four hundred more, and late in the afternoon of that day they delivered to the appellee's operator, in the city of New York, the following half-rate or night telegram, to be sent to the appellant at Eminence, Ky., where he then lived, and which, by the usual course of such business, ought to have been received by him by 9 o'clock the next morning:

"NOVEMBER 18, 1879.
"*To* Z. F. SMITH,
    "*Eminence, Henry county, Ky.*:

"Bought two Erie, six three-quarters; two Michigan, six one-quarter—will hold notice here.

"HORACE MANUEL & Co."

It was received by the operator at Eminence, but never delivered to the appellant. He relied for information as to the condition of the New York stock market upon the daily report of it published in the daily Louisville Courier-Journal, a reliable newspaper published in the city of Louisville, and which he received each day before 8 o'clock in the morning. From it he learned, and it was true, that stocks began to decline on November 18, 1879, and there were then signs of a panic near at hand. This decline continued until November 21, 1879, when it was the greatest, and which day was known as "black Friday." The appellant was daily apprised of what was occurring by his newspaper, but in ignorance of the amount of stock that had been purchased for him. He could have sold all

of it, however, on November 19th, at a loss of not over one thousand, and on the 20th of not over four thousand dollars. Upon the 21st, however, it had so declined that its then value, together with the deposit of the appellant, did not equal what the brokers had paid for it; and they thereupon sold it for a sum which, with the deposit, did not repay them what they had paid out for the appellant, and thus left him in debt to them. In a few days after the sale a reaction in stocks occurred, and by November 28th the stocks sold from the appellant were selling for more than he had paid for them. He brought this action against the telegraph company for damages for failing to deliver the above dispatch, and says, that if he had received it, and thus been informed of the last purchase of stock, he would have kept his "margin" good, and thus saved all his stock; that his deposit was sufficient to have "tided him over the flood," but for this last purchase; and if he had known of it, that, as a reasonable man, he would have covered the decline by an increase of his deposit or sold enough of the stock to have protected the remainder, or have ordered it all sold at the beginning of the decline, and thus have substantially saved himself.

The appellee relies mainly upon two defenses: first, that it is protected from liability by the printed terms and notice upon the form used and accepted by Manuel & Co., upon which they wrote the message; and second, that the alleged damages were not proximate, but too remote to authorize a recovery.

The jury returned the following special findings:

1st. Was the message from Horace Manuel & Co., dated November 18, 1879, delivered to the plaintiff, Z. F. Smith; if so, in what way, and when?

Answer. It was not.

2d. Did the plaintiff, Smith, prior to November 19, 1879, direct the defendant's agent at Eminence not to send his messages to him, but to keep them at his office till he, Smith, called for them?

Answer. He did not.

3d. Was the stock, mentioned in the telegram of the 18th of November, 1879, purchased in New York in obedience to the orders sent them on that day, or at any time previous thereto, by plaintiff?

Answer. It was.

4th. If Smith instructed his brokers to buy said stock by telegram, what was the date of the telegram, and what was its contents?

Answer. By telegram, dated 18th of November, 1879, as follows: "Buy up to amount ordered sold, best advantage, at discretion."

5th. Could Smith, by the use of ordinary diligence, have learned of the purchase on the 18th of November, 1879, independent of the telegram of that date, at any time before Friday, November 21, 1879?

Answer. He could not.

6th. Was the nature of said telegram, and the importance of its prompt delivery, communicated to defendant's agent at New York?

Answer. It was not.

7th. Did the defendant's agents at New York and

Eminence, or either of them, understand the nature of said telegram from its language?

Answer. They did.

9th. If the jury shall find that the telegram of the 18th of November, 1879, was not received by Smith, then they will say whether, if it had been received by him, he would have ordered his stock, or any part of it, to be sold, either on the 19th or 20th days of November, 1879?

Answer. He would.

10th. If the foregoing question is answered in the affirmative, then the jury will say whether Smith would have saved any part of his deposit in New York; and if so, how much in value?

Answer. $5,800, five thousand eight hundred dollars.

11th. Was there a decline in the value of the stock held by Smith's brokers in New York, between the morning of the 19th and the morning of the 21st of November, 1879, equal to ten per cent. of the face value of said stock?

Answer. There was.

12th. If there was such decline, the jury will say whether Smith's brokers had the right to sell said stock?

Answer. They had.

13th. Were Smith's brokers authorized by him to sell any of his stocks on the 18th of November, 1879?

Answer. They were not.

14th. If they were so authorized, how, and in what way, did they receive their authority, and what was it?

Answer. None at all.

A new trial was not asked by either party, nor did either of them object to the form of the inter-rogatories or the answers, and they must, therefore, be taken as true. The appellant asked a judgment upon the findings for $5,800 in damages, while the appellee objected to it, and moved the court to render one for nominal damages only. The motion of the former was overruled and a judgment rendered for eighty-five cents, the cost of the dispatch; and to reverse so much of the final order as overruled the appellant's motion for a judgment for $5,800 in damages, this appeal is prosecuted.

The printed part of the form used in sending the telegram reads thus:

"BLANK No. 45.

"THE WESTERN UNION TELEGRAPH COMPANY.

"HALF-RATE MESSAGE.

"The business of telegraphing is liable to errors and delays, arising from causes which can not, at all times, be guarded against, including, sometimes, neg-ligence of servants and agents, whom it is necessary to employ; most errors and delays may be pre-vented by repetition, for which, during the day, half price extra is charged, in addition to full tariff rates. The Western Union Telegraph Company will receive messages for transmission between certain author-ized stations on its line, east of the Rocky moun-tains, to be sent without repetition during the night, for delivery not earlier than the morning of the next ensuing business day, at one-half of the usual day

rates ; but in no case for less than twenty-five cents
tolls for a single message, and upon the express con-
dition that the sender will agree that he will not
claim damages for errors or delays, or for non-
delivery for such messages, happening from any
cause, beyond a sum equal to ten times the amount
paid for transmission ; and that no claim for dam-
ages shall be valid unless presented in writing within
thirty days after sending the message. —— ——.
Send the following message subject to the above
terms, which are agreed to."

A few cases are to be found in which it has been
held that telegraph companies are to be regarded as
common carriers ; but the later current of authority
is not in this direction, and properly so, because the
*transmission* of messages is necessarily subject to
the risk of mistake and interruption. The wire is
exposed to the interference of strangers ; a sur-
charge of electricity in the atmosphere, or a failure
of or irregularity in the electrical current, may stop
communication ; and it is continually subject to dan-
ger from accident, malice and climatic influence
when the company has not the actual, immediate
custody of the message, as the common carrier has
of the merchandise it carries ; and it should not,
therefore, like a common carrier, be treated not only
as a bailee, but as an insurer. (Western Union Tele-
graph Co. v. Blanchard, 45 Am. Reps., page 480,
and cases there cited.)

It is, however, a public agent ; it exercises a
*quasi* public employment ; carefulness and fidelity
are essentials to its character as a public servant,

and public policy forbids that it should abdicate as to the public by a contract with the individual. He is but one of millions; his business will, perhaps, not admit of delay or contest in the courts, and he is *ex necessitate* compelled to submit to any terms which the company might see fit to impose; but the law should not uphold a contract under which a public agent seeks to shelter itself from the consequences of its own wrong and neglect.

Its liability for neglect is not founded purely upon contract. It is chartered for public purposes; extraordinary powers are, therefore, conferred upon it; it has the power of eminent domain; if it did not serve the public it could not constitutionally lay a wire over a man's land without his consent; and by reason of the gift of these privileges it is required to receive and transmit messages, and is liable for neglect, independent of any express contract. The public are compelled to rely absolutely upon the care and diligence of the company in the transaction of this business, so wonderful in its growth, so necessary to the life of commerce and useful beyond estimate; and if it relies upon a notice or contract to restrict its liability, it must be one not in violation of public policy; and in view of the vast interests committed to a telegraph company, the extraordinary powers given it, and the virtual monopoly it almost necessarily enjoys, the court should compel it *nolens volens* to perform the corresponding duties of diligence and good faith to the public, thereby created.

Any other rule would defeat the very purposes for

vol. 83.—8

which these companies are chartered, to wit: the safe and speedy transmission of messages for the public; and while they may reasonably restrict their liability, yet they can not do so as against their own negligence. They undertake to exercise a public employment, which, in many respects, is analogous to that of a common carrier, and they must, therefore, bring to it that degree of skill and care which a prudent man would, under the circumstances, exercise in his own affairs; and any stipulation by which they undertake to relieve themselves from this duty, or to restrict their liability for its non-use, is forbidden by the demands of a sound public policy. To hold otherwise would arm them with a very dangerous power, and leave the public comparatively remediless. (W. U. T. Co. v. Fontaine, 58 Ga., 433; Wolf v. Western, etc., 62 Pa.,. 83; Sweetland v. Illinois, etc., 27 Iowa, 432; Breese v. U. S., etc., 48 N. Y., 132; U. S. T. Co. v. Gildersleeve, 29 Md., 232; West. Union v. Buchanan, 35 Ind., 429; Hibbard v. Western Union, 33 Wis., 558;. Telegraph Co. v. Griswold, 37 Ohio, 301; Tyler v. West. Union, etc., 60 Ill., 421; Ellis v. The American T. Co., 13 Allen, 234.)

In this instance the failure did not arise in the *transmission* of the message, or from any cause not within the appellee's control, but from neglecting to deliver it.

We now turn to the question, whether the appellant's damages are so far removed from the failure of the appellee to perform its duty as to forbid their recovery? The line between proximate and re-

mote damages is exceedingly shadowy; so much so, that the one fades away into the other, rendering it often very difficult to determine whether there is such a connection between the wrong alleged and the resulting injury as to place them, in contemplation of law, in the relation of cause and effect.

The law does not undertake to charge a person with all the *possible* consequences of a wrongful act, but only with its probable and natural result; otherwise the punishment would often be entirely disproportioned to the wrong, thereby impeding commerce and the ordinary business of life, and rendering the rule impracticable.

Although the damages may arise remotely out of the cause of action, or be, to some extent, connected with it, yet if they do not flow naturally from it, or could not, in the ordinary course of events, have been expected to arise from it, they are not, in a legal sense, sufficiently proximate to authorize a recovery, and the rule, which is common to both the common and civil law, *causa proxima non remota spectatur*, applies. They need not be the *immediate* result of it—intervening events or agencies may contribute to the injury—but they must be certain in their nature and cause, and, as Mr. Greenleaf says, "be the *natural and proximate* consequence of the act complained of." (2 Greenleaf on Evi., page 210.)

It is not sufficient that they may be merely a possible result, traceable to the cause the complaining party may assign; but they must be such as, according to the usual and natural course of things, can be considered as fairly and substantially arising from

it; otherwise, they are not its natural incidents, and can not be considered to have been within the contemplation of the parties when the contract was made.

It is not required that they *must* then have considered them; but they must be such as the parties may fairly be *supposed* to have considered, or at least would have considered as flowing from a breach of the contract if they had then been informed of all the facts. It was said in Leonard v. Tel. Co., 41 N. Y., 544, that "a party is liable for all the direct damages which both parties to the contract would have contemplated as flowing from its breach, if, at the time they entered into it, they had bestowed proper attention upon the subject, and had been fully informed of the facts."

This is substantially the rule laid down in the leading case upon this question, of Hadley v. Baxendale, 9 Exch., 341, and which has been generally followed, both in England and this country. Applying this rule to the case in hand, it does not seem to us that the appellant has brought his case within it.

It is true that the dispatch showed upon its face that it related to a business transaction; and the jury found, as a fact, that the appellee's agents understood it; but the injury did not arise naturally from its non-delivery; and, from the wording of it, it is impossible to suppose that the parties, when it was received for transmission, could have contemplated the injury now complained of, if they had then looked to its non-delivery. It merely apprised

the appellant that his agent had purchased for him. a certain amount of stock. The appellee did not know from it, or in any way, the purpose to be accomplished or that the appellant already owned other stock, or that a knowledge of its contents was necessary to his conduct in keeping a sufficient "margin" with his broker to prevent a loss, or to guide him as to a sale of his stock. There was an. intervening step. If the dispatch had been received, then he might or might not have taken it and acted.. It rested altogether with him, and is unlike the case of an agent, who is ordered by a telegram to do a certain act, but which, by reason of its non-delivery, he does not do, thereby entailing a loss upon his principal. It does not naturally follow that the appellant would have been any better off now if he had received it. As well might A claim the stakes in a race from a railroad company, that, by a delay of its train, has prevented his horse from arriving at the race in time to take part in it, although, if there, he might have been beaten; or a prize offered for the best model of a machine, to be exhibited at a certain place by a certain day, because, by a delay in carrying it, his model did not arrive in time to be exhibited. The consequence which resulted to the appellant was not the ordinary result of the failure to deliver the message in question, and hence can not be supposed to have been in. contemplation when the company undertook to. transmit it. If the minds of the contracting parties had, at the time, been drawn to the contingency of a failure of performance, they could not

possibly, from the nature of the dispatch, have contemplated the loss of which the appellant now complains; and in such a case the company is only liable for nominal damages for its default. (Behm v. West. Union, 8 Biss., 131; Lowery v. Same, 60 N. Y., 198; Tel. Co. v. Gildersleeve, 29 Md., 232; Graham v. Tel. Co., 10 Am. Law Reg., 319; Bank v. Same, 30 Ohio, 555; Landsberger v. Same, 32 Barb., 530.)

It is urged, however, that the jury, by the answer to the ninth interrogatory, found that if the appellant had received the telegram, that he *would* have ordered his stock sold; and that, as this finding was not objected to, it is, therefore, conclusively shown that the loss would not have occurred if the message had been delivered. In our opinion; what the appellant *might* or *would* have done, could not be the subject of a special finding. It was not a matter of fact, and the appellee was not, therefore, bound to object to it; and it does not follow, therefore, that it is conclusively shown that the loss was the direct result of the appellee's failure to deliver the message.

Judgment affirmed.