McPeak v. The Missouri Pacific Railway Company, *Appellant.*

Division Two, May 21, 1895.

| 128 | 617 |
| 64a | 619 |
| 128 | 617 |
| 137 | 198 |
| 128 | 617 |
| 147 | 167 |
| 128 | 617 |
| e98a [1] | 93 |

1. **Practice:** JURY: IMPROPER REMARKS OF JUDGE. Where a jury failed to agree, after being out from 8 P. M. to 10:30 A. M. the next day, when the court reminded them of the trouble and expense of trying the case, and one of the jurors replied that "there's eleven of us that could get together in about a minute," the remark of the court that "Verdicts are often reached in cases after further consideration. * * * I don't want to put you gentlemen to any discom-

McPeak v. The Mo. Pac. R'y Co.

fort unnecessarily; yet I think you ought to look it over, and experience shows that it often takes some little time to get their minds together. I trust and presume that every juror is acting rationally and that nobody is acting from a dogmatic spirit, merely for the purpose of asserting his opinion," will constitute reversible error, a verdict having been agreed upon in an hour and a half after it was made. (GANTT, P. J., *dissenting.*)

2. **Master and Servant:** WHEN SERVANT'S ACT BINDS MASTER: PLEADING. While the act of the servant must, to bind his employer, be in the line of his duty to his master, yet if the petition states the relation from which the duty necessarily flows, it is sufficient without further averment. (SHERWOOD, J., *dissenting.*)

3. **Railroad:** NEGLIGENCE: DUTY OF BRAKEMAN: PERSONAL INJURY. Where a brakeman at the brake rod in the cupola of a caboose car from which he could see up and down the track, on a signal for brakes to stop the train, excitedly and recklessly calls out in the hearing of passengers, "Jump! jump for your lives!" the company is liable for injury to a passenger jumping from the train, although there was no real danger. (SHERWOOD, J., *dissenting.*)

4. ———: ———: ———: PRACTICE. Where there is a conflict between the witnesses for the plaintiff and those for the defendant upon a material allegation of the petition, the question is one of fact and veracity to be decided by the jury.

5. ———: ———: IMMINENT PERIL: DISCRETION. One placed in a situation of apparent imminent peril, without time to deliberate, and acting upon the instinct of self-preservation, as a prudent person might be expected to act in the circumstances, who is injured by adopting a dangerous alternative in attempting to escape, may still recover from one by whose negligence he has been impelled to act, although no injury would have resulted had no attempt to escape been made.

6. ———: ———: DUTY OF BRAKEMAN: PERSONAL INJURY: JUMPING FROM TRAIN. It was a question for the jury, in this case, to determine whether a reasonably prudent man would have jumped from the train, when urged to do so by the servant in charge of the brake, who occupied a position from which he could readily discover danger, considering the construction of the car, the signal for brakes and that the urgency of the warning left no time for deliberation. (SHERWOOD, J., *dissenting.*)

*Appeal from Bates Circuit Court.*—HON. JAMES H. LAY, Judge.

REVERSED AND REMANDED.

Action for damages for injuries received while a passenger on the defendant's train. Leaving off the usual formal allegations, the petition is as follows:

"Plaintiff states that on the morning of March 12, 1892, he entered defendant's regular train over its interstate road at Butler, Missouri, as a passenger thereon from Butler to Foster, Bates county, Missouri; that said train was a 'mixed train' consisting of freight cars, a combination express, mail and passenger car and what is known as a caboose car attached to the passenger car and used as a 'smoker' and was the rear car of the train; plaintiff states that on said train the brakeman did and performed the duties of porter and took charge of the passenger and caboose cars and calling stations and assisting passengers on and off the cars, and giving them information and assistance, and looking after their safety and comfort, and having general supervision of the car and its occupants; that such are the duties of porter and on its said train these duties are devolved on its brakeman by defendant.

"Plaintiff states that he took his seat in said smoking or caboose car and that the train left Butler about 'on time,' being 7:15 A. M.; that there was a train just in front of train on which plaintiff was a passenger and also a work or gravel train just behind it; that after leaving Butler some three to five miles and while said brakeman and another of defendant's employees were in the 'lookout' of said caboose car the engine whistled down brakes and said brakeman or porter instantly, excitedly, negligently and recklessly called out 'jump' or 'jump for your lives.' Plaintiff, knowing that there was a train just in front and another just in the rear, started to get off the train by the rear platform; that, as he afterward learned, said train was on a down grade and running very rapidly and, there being no

chain across in front of the rear door of the car and plaintiff not being able to turn to the steps, jumped and fell to the ground from the back part of the platform through the opening instead of getting off by the side steps as he would and could have done if the chain guard had been properly placed and kept across the back end of the platform of said car.

"That by reason of the negligence and carelessness of defendant and its employees as aforesaid and as a direct result thereof the large bone of plaintiff's right leg was broken and in such a way as to involve permanently the knee joint, and the left leg was and is paralyzed from the knee to the hip joint and the upper part of the large bone of the lower arm right at the elbow was broken, destroying the use of the joint and breaking loose the ligaments and muscle attachments about the elbow and the left shoulder was bruised and broken so that the arm can not be raised or moved sideways and the wrist joint was so injured that its movement in any direction is destroyed and the hand can not be turned either forward, back or sideways and the hand and fingers have lost their motion and strength so that by these injuries to the left arm, shoulder, elbow, and wrist the entire left arm is totally and permanently useless and paralyzed and that by the fall and concussion the small of the back was so injured and affected that there is pain and soreness there and plaintiff requires assistance and help to get up in the mornings and that all of said injuries are permanent and render plaintiff a cripple for life. That prior to these injuries plaintiff was of great strength, activity and power, athletic and healthful; that since that time he has become weak and lost strength and flesh, is without activity and his general health has become greatly and permanently impaired.

"Plaintiff avers that he has suffered great pain and anguish of body, and intense mental anxiety from the wounds, injuries and bruises aforesaid and was confined to his bed and house for six months and can now get about only with the aid of canes and crutches. Plaintiff says that he was agent and attorney at Foster for various parties and engaged in business and that he realized therefrom the sum of $100 per month, all of which during the time he was so confined to his bed and house was a total loss to him and that he has been at great expense in procuring medical and surgical attention and services and that he has paid and is to pay therefor the sum of $200 and pleads the same and loss of time as special damages, averring the same to be $800.

"Plaintiff alleges that all of said injuries were occasioned by the fault, negligence, careless and indiscreet conduct of defendant, its agents, servants and employees in the way and manner hereinbefore stated and that plaintiff himself was without fault or negligence and in no manner contributed to said injuries by any fault or negligence of his own.

"Plaintiff avers that by the injuries aforesaid and the pain and suffering and loss of time and money expended aforesaid he has been damaged in the sum of $30,000, for which sum and for his costs herein he prays judgment against said defendant."

The answer of defendant is the following:

"Said defendant for answer to plaintiff's petition denies each and every allegation therein contained; wherefore it prays to be discharged with its costs. Said defendant for further defense states that if said plaintiff sustained the injuries charged in petition, it was by reason of his own negligence, carelessness and recklessness directly contributing thereto in jumping from the moving train without any legal excuse there-

for, and without any fault of this defendant; wherefore defendant prays to be discharged with its costs."

The reply was a general denial.

The facts in evidence are substantially these: On the twelfth day of March, 1892, the defendant company was running a mixed train from Butler in Bates county, to the town of Foster in the same county and beyond. This train was made up of a combination express, freight cars, a mail car and a passenger car, and to the last named car, was attached what is commonly termed a "caboose," a car which was used as a "smoker," which was the rear car of the train.

On the morning of the day mentioned, plaintiff, W. A. Ephland, Grant Goodenough and F. M. Thrall were passengers who preferred to ride in the "caboose" rather than in the passenger car; and the general course of the road is south until it reaches the junction of the two roads, some three and a half miles from Butler, where the road on which plaintiff was traveling branches off from the main line and proceeds in a southwesterly and westerly direction through Bates county into the state of Kansas. The caboose in which plaintiff and the others named were riding had seats upon either side of the car, running lengthwise with same. On the west side and near the south end of the caboose, there was an open cupola, with a chair; and a brake immediately south of same in the cupola. The brakeman who handled this brake—being the only brake in the car—when occupying the chair had his face turned to the south, toward the engine. On the opposite or east side of said caboose going south, there was another cupola, boxed up to some extent, with two seats facing each other therein. The seat along the caboose on east side also passed under said east cupola, but the view of said cupola on east side of car was partially obstructed by its being boxed up.

The caboose is a kind of box car with windows in the sides.

There is positive testimony that Abell, the conductor, and Lamb were occupying seats in the east cupola in which there was no brake. Abell, the conductor, sat facing south, and opposite him, their knees touching, sat Lamb, a "swing" brakeman, who was put on to go out with the train leaving Butler in the morning, and returned upon the other train when it was met. His duties were to take the switch list prepared by the conductor at every station, and get the cars out at the place designated on the freight list, and also to set the outside or end brakes of the car upon signal to that effect being given. Lamb had nothing whatever to do with calling out the stations nor with the passengers getting on and off the caboose; those were duties belonging to the hind brakeman. On the opposite or west side of the cupola sat Joseph Little, the hind brakeman, who sat at the brake on the west side of the cupola, the only brake inside the caboose, and he was facing south. The respective positions occupied in the cupola by the parties mentioned, is shown by their direct and unequivocal testimony, and Thrall testified that Abell and two trainmen were up in the cupola, and neither plaintiff nor Ephland nor Goodenough would venture to swear that Abell, Lamb and Little were not in the cupola.

There is some controversy as to who the brakeman who sat at the hind brake in the cupola was. Plaintiff, Ephland and Goodenough testified with more or less assurance that it was Lamb, but their testimony loses much of its probative force from the fact that the brakeman who sat at the hind brake had his face toward the south, and their opportunities to see who it was who sat at the hind brake in the cupola were by no means so good as those who were seated in the

cupola, and their testimony, as already seen, is direct and positive. In fact it is conceded by all the witnesses that the brakeman who occupied the seat on the west side of caboose, attended to the only brake in said car, and that he was facing south, toward the engine, from the time the train left Butler until the accident.

With matters in this situation, when the train had proceeded southward one and a half miles, the usual signal for brakes was given, a single blast of the whistle. The train was then traveling about fifteen miles per hour, and the signal was given in order to pick up a flagman, who had gone out on a freight train, which had preceded the one on which the plaintiff was riding, and stopped off to warn the crew on plaintiff's train that the other train was on ahead. When this whistle was sounded, plaintiff testifies that he was sitting in the *north* end of the caboose, and *could not see whether any person was sitting in the cupola or not.* Yet he also testifies that upon the blast of the whistle being made, Lamb sprang to his feet very excitedly and hallooed out, "Jump off," and on account of his manner of jumping and the manner of his words, the plaintiff started out of the car and jumped off.

In another place, describing to the jury how he got off the train, plaintiff states: "I think the door was open; I won't be positive as far as that is concerned, and when I started out I remarked to the passengers. I says, 'Come on, boys,' and just shot right out. There was nothing to prevent me from going straight out of the door and right off the car; there was no obstruction whatever. I just run out and jumped off in the center of the track." Plaintiff also testifies that he does not know for what the signal whistle was blown, nor that he went to the windows to see what

was the cause for its being blown, though he could readily have done so.

The testimony of Ephland is not so positive as to what was said by Lamb, but he thought the expression was: "For God's sake jump," "Jump for your lives," or "Jump off," he couldn't exactly say which. This witness also states that Lamb, whose manner was hurried or excited, after making the exclamation, then swung down from the platform of the cupola, and ran out of the door.

Goodenough testifies that the first thing that drew his attention was the brakeman jumping to his feet and hallooing, "For God's sake, boys, jump." That the brakeman said this in an excited manner, and the witness states: "We all jumped to our feet, and Mr. McPeak jumped off, and Mr. Ephland jumped off, and I jumped off, the rear end of the car."

None of the witnesses for the plaintiff, however, pretend to deny that the brake in the cupola was not set. Nor that it was set by Little, the hind brakeman, who began to set it as soon as the signal was given, a fact uncontradicted and testified to both by Abell and Little. Nor that Lamb did not, as soon as he swung down, go and set the brake at the front end of the car, one of his duties as "swing" brakeman, a fact testified to by Lamb himself, Abell, and, in effect, by Little. Thrall, a farmer, testifying for defendant, says he thought he heard Lamb halloo, but says Lamb was up there in the lookout then, and said something, hallooed, but that he said nothing about jumping off, or words to that effect.

Thrall, whose first name is Frank, gives this rather ludicrous account of the transaction now in litigation: "Somebody hallooed and Mr. McPeak jumped up, says 'Oh, God!' or 'Oh, my God!' and ran out. Mr.

Ephland followed him, and I went out after Mr. Eph-
land. Well, when Mr. McPeak went through the door
it kind of swung to and as Mr. Ephland pulled the
door open, I saw Mr. McPeak jump off the train and I
throwed my hand on Bill, and I says, 'Bill, don't
jump.' And Mr. Goodenough run between me and
Mr. Ephland and says, 'Jump, boys, jump,' and with
that Mr. Ephland jumped off and this man jumped off
right after him. They both jumped off about the
same time. I run down the steps and couldn't see
anything and Bill Lamb was standing on the passenger
coach steps, and Bill says: 'Frank, what in the hell
is the matter back there?' and I says, 'Every son of a
bitch has jumped off back here.' And I went over on
the other side and looked ahead, and couldn't see any
danger. About that time the train slowed up, and me
and the conductor stepped off and went back.''

Lamb and Little deny that they used any such
exclamation as "Jump off," or any words to that
effect. Little and Abell, who were both in the cupola,
deny that they heard any such exclamation made; and
Abell, Lamb and Little deny that they heard any one
make such an exclamation, and they also deny that they
thought, when the usual signal was given for brakes,
that anything unusual had occurred, or that they were
at all excited. And the evidence shows, that at the
time the whistle was blown, there was no train in sight
at either end of the track. On the other hand, it is
evident, from what plaintiff testifies, and his actions
demonstrate this, that he was *greatly excited and scared,*
and that he had been somewhat injured in a wreck or
collision on a former occasion. Ephland and Good-
enough were also excited to some extent, but they did
not take a *flying leap,* as did plaintiff, but held on to
the railing and swung themselves down, and it does
not appear that they received any considerable injury.

Evidence was also given as to the extent and permanency of plaintiff's injuries.

At the close of plaintiff's case, defendant asked an instruction in the nature of a demurrer to the evidence, which being denied, evidence was introduced on its behalf, the substance of which has already been set forth. The case was then submitted to the jury on the following instruction, among others, given at the instance of defendant: "The court further instructs the jury that, under the evidence in this case, defendant was guilty of no negligence in failing to provide a chain, or bar, or hand-rail, across the north end of the platform of the caboose on which plaintiff was riding."

The case was submitted to the jury at about 8 o'clock P. M., on the twentieth day of February, 1893. At 10:30 o'clock A. M., on February 21, 1893, the jury was called in and the court addressed the following remarks to them:

*The Court*—"Gentlemen, have you agreed upon a verdict?

*The Foreman*—"No, sir.

*The Court*—"It was a great deal of trouble to try this case, and a great deal of expense, and I don't have any expectation of ever getting better men to try it than you.

*Mr. Redford, one of the jury*—"Judge, there's eleven of us that could get together in about a minute. (Exceptions saved by defendant.)

*The Court*—"Verdicts are often reached in cases after further consideration, by trying it a little longer. I don't want to put you gentlemen to any discomfort unnecessarily, yet I think you ought to look it over, and experience shows that it frequently takes some little time for jurors to get their minds together. I trust and presume that every juror is acting rationally in this matter and that nobody is acting from a dog-

matic spirit merely for the purpose of asserting his opinion.'' To which the defendant at the time excepted.

Afterward, to wit, on the same day (June 21, 1893), at 12 o'clock M., the jury returned into open court the following verdict, to wit: ''We, the jury, find the issues for the plaintiff and assess his damages at $4,700. John E. Shutt, foreman.''

Thereupon the court, in accordance with said verdict, rendered its judgment in favor of plaintiff and against defendant for the sum of $4,700; to which action of the court,. the defendant, by its counsel, then and there excepted. After unsuccessful motions for a new trial and in arrest, defendant appealed to this court.

*R. T. Railey* for appellant.

The court should have sustained defendant's demurrer to the evidence, at the conclusion of the whole case. (1) Plaintiff assumed the risks incident to his position, since it was more dangerous than that regularly provided for passengers, and since he took it, not from necessity, or at the request of defendant, but for his own pleasure. *Carroll v. Railroad,* 107 Mo. 653; *Tuley v. Railroad,* 41 Mo. App. 432; *Smotherman v. Railroad,* 29 Mo. App. 265; *Harris v. Railroad,* 89 Mo. 233; *Hickey v. Railroad,* 14 Allen, 433; *Railroad v. Hoosey,* 44 Am. Rep. 120; *Railroad v. Fay,* 63 Am. Dec. 329; *Brown v. Railroad,* 49 Mich. 153; *Doggett v. Railroad,* 34 Iowa, 285; *Railroad v. Thomas,* 1 Am. and Eng. R. R. Cases, 79; *Torrey v. Railroad,* 147 Mass. 412; *Bates v. Railroad,* 147 Mass. 255; *Files v. Railroad,* 149 Mass. 206. (2) Even if it be conceded that Lamb exclaimed, ''Jump off,'' and that plaintiff acted upon said suggestion, and did jump off. the rear end of the

train while it was traveling fifteen miles per hour, yet, as Lamb was not acting in his line of duty in making such exclamation—if he did make it—nor within the scope of his employment, the defendant is not liable therefor, although said Lamb may have been guilty of personal negligence in making use of said expression. *Haehl v. Railroad*, 24 S. W. Rep. 740; *Farber v. Railroad*, 116 Mo. 93; *Sherman v. Railroad*, 72 Mo. 65; *Coal Co. v. Herman*, 86 Pa. St. 418; *Railroad v. Perry*, 27 S. W. Rep. (Tex.) 497; *Davis v. Houghtelin*, 50 N. W. Rep. 766; *Snyder v. Railroad*, 60 Mo. 419; *Cousins v. Railroad*, 66 Mo. 572; *Golden v. Newbrand*, 52 Iowa, 59. (3) There being no real danger, and no reasonable cause to apprehend any, plaintiff was guilty of contributory negligence in running out of the caboose and jumping off a train going fifteen miles per hour, in the opposite direction from which he jumped. *Railroad v. Felton*, 33 Am. and Eng. R. R. Cases, 533; *Railroad v. Wallen*, 26 Am. and Eng. R. R. Cases, 219; *Filer v. Railroad*, 49 N. Y. 52; *Railroad v. Aspell*, 62 Am. Dec. 323; *Railroad v. Rosenberry*, 11 S. W. Rep. 212; *Kleiber v. Railroad*, 107 Mo. 249; *Harris v. Railroad*, 89 Mo. 233; *Smotherman v. Railroad*, 29 Mo. App. 265; *Peck v. Railroad*, 50 Conn. 379; *Spohn v. Railroad*, 22 S. W. Rep. 692; *Railroad v. Ware*, 1. S. W. Rep. (Ky.) 494. (4) Even if Lamb had been at the brake, and while in the line of his duty had said, "Jump off," yet, as there was no imminent danger, and no reasonable cause for anticipating any, and as there was no occasion for such remarks, and as the brakeman was facing the south and looking toward the engine instead of the passengers, and did not know the passengers were off until the train stopped, it can not be said that defendant was bound to anticipate that an adult, riding in the caboose, where the usual business of the company was transacted, and often done hurriedly, would recklessly

jump off the train, in the opposite direction from which it was traveling, simply because the brakeman said, "Jump off." The demurrer to the evidence should, therefore, have been sustained. *Henry v. Railroad*, 76 Mo. 294; Cooley on Torts, p. 68, *et seq.*; Bishop on Non-Contract Law, secs. 42, 43; *Brown v. Railroad*, 20 Mo. App. 225; *Searle v. Railroad*, 65 Tex. 274; *Hudson v. Railroad*, 101 Mo. 33; *Ewing v. Railroad*, 23 Atl. Rep. (Pa.) 340. (5) Plaintiff's first instruction was erroneous. *First*. It allowed the jury, in determining plaintiff's conduct, to consider matters unknown to him at the time of the accident. *Little v. Macadaras*, 29 Mo. App. 335; *Gessley v. Railroad*, 26 Mo. App. 161; *Doty v. Sitneburg*, 25 Mo. App. 333; *Waddingham v. Hulett*, 92 Mo. 535. *Second*. It authorized the jury to return a verdict for plaintiff, if the latter was induced by Lamb's exclamation to jump from the train, without submitting to them the proposition as to whether or not the exclamation, if any was made by Lamb, constituted negligence on the part of defendant. *Kleiber v. Railroad*, 107 Mo. 249; *Dowell v. Guthrie*, 99 Mo. 663; *Weiderkind v. Co.*, 65 Cal. 431; *Andrews v. Parker*, 48 Tex. 94; *Wilburn v. Railroad*, 36 Mo. App. 203. *Third*. It authorized a verdict for plaintiff, if the jury believed that plaintiff was induced to jump from the train by Lamb's exclamation, without submitting to them the proposition as to whether or not a prudent man would have acted as did plaintiff under the circumstances surrounding him at the time. *Kleiber v. Railroad*, 107 Mo. 247; *Railroad v. Ware*, 1 S. W. Rep. (Ky.) 494; *Twomley v. Railroad*, 69 N. Y. 158; *Haff v. Railroad*, 4 McCrary, 622; Beach on Contributory Negligence, p. 57. *Fourth*. It authorized the jury to return a verdict for plaintiff, if plaintiff was induced by Lamb's declarations to jump off, without requiring them to find that there was imminent danger, or even

that plaintiff believed there was imminent danger at the time, or that, as a prudent man, under the circumstances, he had a right to assume there was imminent danger. *Kleiber v. Railroad, supra; Jones v. Boyce,* 1 Stark. 483; *Spohn v. Railroad,* 22 S. W. Rep. 692. *Fifth.* Said instruction ignores the question as to whether or not Lamb was acting in his line of duty or within the scope of his employment, and was authorized to represent and bind defendant, in the making of said exclamations (if any were made by him). *Haehl v. Railroad,* 24 S. W. Rep. 740; *Farber v. Railroad,* 116 Mo. 93; *Sherman v. Railroad,* 72 Mo. 65; *Railroad v. Perry,* 27 S. W. Rep. 497; *Golden v. Newbrand,* 52 Iowa, 59. (6) Plaintiff's second instruction is subject to the same criticism as the first. (7) The remarks of the court were clearly improper and forced a verdict. *Insurance Co. v. White,* 24 S. W. Rep. (Ark.) 427; *Randolph v. Lampkin* 14 S. W. Rep. (Ky.), 538; *Hank v. Allen,* 126 Ind. 568.

*T. W. Silvers, Graves & Clark, P. H. Holcomb* and *J. D. Parkinson* for respondent.

(1) *First.* Under the first head appellant labors to show that the demurrer to the evidence should have been sustained. The cases cited by appellant are not in point. In each case cited plaintiff had taken an exposed position on platform of car or otherwise. In this case plaintiff was in the car provided for passengers. *Ephland v. Railroad,* 57 Mo. App. 163; *Tibby v. Railroad,* 82 Mo. 292; *Ashbrook v. Railroad,* 18 Mo. App. 304; *Gentle v. Railroad,* 33 Mo. App. 361. *Second.* But grant it, that, when plaintiff entered the caboose, he took upon himself the necessary inconveniences and risks which accompany that sort of a car, in its relation to the management of the train, it does not interfere

with plaintiff's right to recover in this case.  The evidence discloses conduct not usual in the ordinary business of running the train and his position there was not the cause of the injury.  *Ephland v. Railroad, supra.* (2)  *First.*  Under proposition 2, appellant maintains that, although it be conceded that Lamb did make the exclamation, yet the company is not liable, for the reason that he was not acting in the line of his duty.  The cases relied upon by appellant are all cases wherein the relation of passenger and carrier did not exist.  The case at bar is one with the relation of passenger and carrier.  The duty of the carrier is entirely different and the rule of law as well.  Where this relation exists "the carrier is under obligations to carry the passenger safely and properly and treat him respectfully; and holds him responsible for the conduct of his servants, to whom he intrusts the performance of this duty.  He is bound to protect his passengers from violence and insults by strangers and co-passengers, and *a fortiori* against the violence and insults of his own servants." *Farber v. Railroad*, 116 Mo. 91; *Croaker v. Railroad*, 36 Wis. 657; *Railroad v. Flexman*, 103 Ill. 546; *Spohn v. Railroad*, 101 Mo. 452; *Spohn v. Railroad*, 87 Mo. 81; *Eads v. Railroad*, 43 Mo. App. 545; *Goddard v. Railroad*, 57 Me. 202; *Railroad v. Jackson*, 6 Am. and Eng. R. R. Cases (Ind.), 180; *Railroad v. Hinds*, 53 Pa. St. 212; *Weed v. Railroad*, 17 N. Y. 362; *Railroad v. Finny*, 10 Wis. 388; *Bryant v. Rich*, 106 Mass. 189; *Rounds v. Railroad*, 64 N. Y. 129; *Shea v. Railroad*, 62 N. Y. 180; *Cohen v. Railroad*, 69 N. Y. 170; *Stewart v. Railroad*, 90 N. Y. 588; *Ramsden v. Railroad*, 104 Mass. 117.  *Second.*  Even if the contention of counsel as to the law was correct, his position is not tenable under the evidence.  (3) Under his third division appellant contends that it was contributory negligence to leave the train under the circumstances in evidence.  *First.*

The most that could be required would be to submit the question of negligence to the jury. This was done. Whether it was negligence to leave the car, under the circumstances, of this case, is a question for the jury. Beach on Contributory Negligence [2 Ed.], p. 54, sec. 40; Whitaker's Smith on Negligence, sec. 392; Hutchinson on Carriers, sec. 534; 2 Shearm. & Redfield on Neg., sec. 647; *Kleiber v. Railroad*, 107 Mo. 240; *Dimmitt v. Railroad*, 40 Mo. App. 654; *Siegrist v. Arnot*, 87 Mo. 208; *Jones v. Royce*, 1 Stark. 493; *Stokes v. Salstonstall*, 13 Peters, 181; *Funk v. Potter*, 17 Ill. 406; *Eastman v. Sanborn*, 3 Allen, 576; *Twombly v. Railroad*, 69 N. Y. 158; *Linnyham v. Sampson*, 126 Mass. 506; *Ingells v. Bills*, 9 Metc. 1; *Cody v. Railroad*, 24 N. E. Rep. 402. We would also call attention to the *Spohn case*, where the evidence shows that where the accident occurred the train was running forty miles per hour. *Second.* "The law has so high regard for human life that it will not impute negligence to an effort to preserve it." This is in cases where an attempt is made to save others from apparent danger. The rule is and should be stronger, where one is attempting to save himself from threatened danger. *Peyton v. Railroad*, 41 Am. & Eng. R. R. Cases (La.), 550; *Eckert v. Railroad*, 43 N. Y. 503; Beach on Cont. Neg. [2 Ed.], sec. 42; Thompson on Neg., 1174; Pierce on Railroads, 328; Rorer on Railroads, 1029. *Third.* If the evidence shows the act to be willful or wanton, contributory negligence would be no bar to the action, even if the evidence indicated such, a proposition which we deny in this case. Beach on Cont. Neg. [2 Ed.], secs. 28, 30, 64; *Railroad v. Bodemer*, 139 Ill. 59; *Railroad v. Hirst*, 30 Fla. 1. *Fourth.* Having directed the act to be done the defendant is estopped from claiming that it was contributory negligence to obey the direction of its servants. *Morrissey v. Ferry Co.*, 47 Mo. 54; *Tib-*

*bey v. Railroad*, 82 Mo. 292; *McGee v. Railroad*, 92 Mo. 208; *McIntyre v. Railroad*, 57 N. Y. 286; *Fuller v. Railroad*, 39 N. Y. 351; *Burcher v. Railroad*, 98 N. Y. 128; 2 Redfield on Railroads, 278 and note; Thompson on Carriers, page 227, note 6; Beach on Cont. Neg. [2 Ed.], secs. 67, 68. (4) *First.* This is substantially the same objection made under division 3 and cases cited under this point are too wide of the mark to require notice. It was not negligence to leave the train under the circumstances detailed in evidence. *Vide* authorities under point 3. *Second.* It is further urged that even if the brakeman made the exclamation, he, at the time, was looking toward the engine and not the passengers and for that reason the passengers were not justified in acting thereon. This is not the law. If the exclamation was made in the presence of the passengers, it is sufficient. *Ephland v. Railroad, supra.* (5) *First.* This instruction does not include matters not known to plaintiff at time of accident. *Second.* It is true, that this instruction does not submit the question of whether or not the act of the brakeman was negligence, but it is squarely presented to the jury in instruction number 2, and if the entire series of instructions properly declare the law, it is sufficient. *Owens v. Railroad*, 95 Mo. 181; *Vinegar Mfg. Co. v. Guggemos*, 98 Mo. 391; *Bank v. Hatch*, 98 Mo. 376; *Harrington v. Sedalia*, 98 Mo. 583; *Schroeder v. Michel*, 98 Mo. 43; *State v. Gregory*, 30 Mo. App. 582. *Third.* Then again the court could as a matter of law declare this act of Lamb to be negligence. This instruction standing alone does nothing more. Whitaker's Smith on Neg., p. 391; 2 Thompson on Trials, sec. 1681; *Coal Co. v. McIntosh*, 82 Ky. 554; *Pleasants v. Railroad*, 95 N. C. 195; *Railroad v. O'Connor*, 6 West, 773. *Fourth.* The instruction simply tells the jury that, if they find certain facts from the evidence, then

the finding should be for plaintiff.   This is just simply equivalent to saying that if you find such facts from the evidence, the defendant was guilty of negligence, and your finding should be for plaintiff.  This is proper. *Goodwin v. Railroad*, 75 Mo. 73.   *Fifth.*  There is nothing in this objection to instruction number 1.  Whether he acted prudently in leaving the train, under the circumstances, is covered by instruction number 2.   It is also covered by defendant's instructions 8, 9 and 10. If the instructions as a whole properly declare the law, it is sufficient under every case decided by this court, since the *Owens case, supra.*  Lamb was one of defendant's employees in charge of the train and defendant owed plaintiff the duty of protecting him from the acts of such employee.   A failure was a violation of the carrier's contract.   *Vide* authorities under point 2. (6)   There is nothing in this objection to the effect that the instruction leaves out the question of Lamb being in line of his duty.   *Vide* authorities under point 2 and under subdivision "*fifth*" of point 5.   (7) There was no error in the remarks made by Judge LAY to the jury.   The remarks were perfectly proper, and it would require a very strong imagination to conjure up the idea that they tended in any way to coerce a verdict. Thompson on Charging the Jury, sec. 58, p. 82; *Allen v. Worden*, 50 Ga. 53; *Pierce v. Rehfuss*, 35 Mich. 53.

SHERWOOD, J.—I.   Among the grounds urged in the motion in arrest, and incidentally and indirectly urged in this court by quotation from the authorities, is the point that the petition does not state facts sufficient to constitute a cause of action.   This, of course, if true, is such a defect as is never waived, and may be raised at any time while the cause remains pending and undetermined, either in the court of first instance, or in that of last resort, and may be raised by the court of

its own motion. *Smith v. Burrus*, 106 Mo. 94, and cases cited; R. S. 1889, sec. 2047; *Ibid.*, sec. 2304.

It will be noted that it is not averred in the petition that the litigated act was one authorized by the master, or done by the servant within the scope of his employment. The act must have been done by the servant *"in the line of his employment, and in furtherance of the master's business."* And "in order to be held chargeable for the acts of another, the person sought to be charged must at least have the *right* to direct such person's conduct, and to prescribe the mode and manner of doing the work; and the person for whose acts he is sought to be charged must, *at the time* when the act complained of was done, not only have been acting for him, but also must have been authorized by him, either expressly or impliedly, to do the act." Wood, Mast. & Serv. [2 Ed.], pp. 525, 527.

There is nothing in the petition which directly or indirectly charges that the act done, to wit, the exclamation "jump," etc., was within the scope of the servant's duties, or within the boundaries of his delegated authority, something indispensable to the statement of a cause of action against the defendant. "Unless the duty results, in all cases, from the stated facts, the declaration so framed will be bad." And the express allegation of an existing duty will not aid the declaration, if the facts recited do not raise the duty, a breach of which was complained of. If the facts stated do this, then the allegation of duty is superfluous. 2 Thomp. Neg. 1244, and cases cited.

"Beyond the scope of his employment the servant is as much a stranger to his master as any third person. The master is only responsible so long as the servant can be said to be doing the act, in the doing of which he is guilty of negligence, in the course of his employment." *Marrier v. Railroad*, 17 N. W. Rep. 952.

If the servant steps out of the course of his employment to do a wrong either negligently, fraudulently or feloniously, the master is no more liable than a stranger. *Foster v. Bank*, 17 Mass. 479. This court has frequently announced the same principle. *Snyder v. Railroad*, 60 Mo. 413; *Sherman v. Railroad*, 72 Mo. 63; *Cousins v. Railroad*, 66 Mo. 576; *Stringer v. Railroad*, 96 Mo. 299.

In *Snyder's case, supra*, it was ruled that a petition fails to state a cause of action which states that the act was done *while* the servant was engaged in the service of the master, but which *fails to state* that the *act complained of* was one which *pertained to the particular duties of that employment;* and that the general averment that the act of the servant was done while he was acting within the line of his duty was a mere conclusion of law, and did not help or cure the other defective averments, and so it was held, that the general demurrer to the petition in that case was well taken. Of similar import is the ruling made in *Davis v. Houghtelin*, 50 N. W. Rep. 765, where a general demurrer questioned the averments of the petition, and on that occasion the petition was held fatally defective because of failing to set forth *facts* showing, in terms, that the act done was within the range and authority of the servant's duties.

In *Golden v. Newbrand*, 52 Iowa, 59, cited with approval in the preceding case, Roenspeiss was given a revolver by defendants and told to guard their brewery. Subsequently one Golden came on the premises and did some damage to the property, whereupon Roenspeiss pursued him, and as he ran away, shot and killed him. Upon these facts being developed in evidence, the lower court granted the motion of defendants to exclude all the evidence introduced, because it failed to show any liability on the part of the defendants, and in discussing the action of the trial court, SEEVERS, J., said: "The theory of appellant is that Roenspeiss was employed to

guard and protect the brewery, for which purpose he was furnished with a pistol, and that he shot the deceased while in the line of his duty. Without determining whether if this was all the defendant would be liable, we think the fact that the deceased was retreating from the brewery, at the time the fatal shot was fired, shows conclusively it was not fired for or with the intent of protecting the brewery, or in the line of Roenspeiss' duty. If Roenspeiss had shot with the pistol from the brewery a person peaceably passing along the highway, the defendants clearly would not have been liable, and we think there is no essential difference between the case supposed and the one at bar. To protect the brewery did not require Roenspeiss to shoot and kill a person who was retreating therefrom. The killing was not, therefore, done in the line of the duty Roenspeiss was employed to perform." And on this view, the judgment was affirmed.

Applying to the case at bar the tests elicited from the foregoing authorities, it must be apparent that the petition is fatally defective in that it is wholly lacking in an essential allegation, without which the plaintiff is not entitled to recover, because in actions for injuries by negligence, even under code systems, the fundamental principle is to be applied that, in order to the validity of the petition, it must contain "such facts as, if they were admitted, would justify the court in rendering judgment for the plaintiff." 2 Thomp. Neg. 1243.

Nor is the petition in this instance rendered a whit stronger by reason of the allegation that "there being no chain across in front of the rear door of the car, and plaintiff not being able to turn to the steps, jumped and fell to the ground from the back part of the platform through the opening instead of getting off by the side steps as he could and would have done if the chain

guard had been properly placed and kept across the back end of the platform of said car.''

It is passing strange that such an allegation should have been allowed to be made even the partial basis for a recovery. That chains, etc., should be used in preventing the escape of *wild Texas steers* or ''those pampered animals that rage in savage sensuality,'' and compose the menageries that travel through the country on our railroads, excites no surprise, but that similar restrictive measures should be employed to restrain *human beings* from making fierce dashes for liberty, is certainly without parallel. And yet evidence was gravely introduced to support this remarkable allegation. This being the case, it was but natural that the jury should have given it weight, and used it in support of, and to swell their verdict. For this reason it was that instruction number 7 asked by defendant should have been given; for that instruction was in the nature of a motion to exclude the grossly incompetent evidence.

It will not do to say, as does counsel for plaintiff, that they *asked no instruction* upon that allegation and evidence; purposely refrained therefrom, because, as it was, the jury remained in the dark upon the matters involved in that allegation and its supporting evidence. Indeed, the lower court must have regarded the allegation valid and the evidence competent, or surely it would not have denied the instruction, which would have excluded it. If the lower court regarded the allegation and evidence as constituting one of the valid bases for a recovery, small blame belongs to the jury for doing the same thing, hence the necessity for granting the instruction, and the error in its denial. Moreover, by the express terms of instruction 3, given at plaintiff's instance, the jury were directed to ''take

into consideration *all* the facts and circumstances detailed in evidence.''

II. The same considerations which require that the petition should, by *facts stated,* show and allege that defendant's brakeman Lamb was in the line of his duty and in furtherance of his employer's business, when he made the supposed terror-creating exclamation, also require that *proof* should be made of such allegations, and the burden of making such proof, of course, lies on the party holding the affirmative. We do not regard this proof as having been made, and for these reasons: Abell, the conductor, Little, the hind brakeman, and Lamb, the alleged peccant panic-breeder, all testify, and their testimony on this point is uncontradicted, and the facts were peculiarly within their own knowledge, they being in the employ of the defendant, that it was no part of Lamb's duties to do anything in regard to the passengers, and there is no circumstance in evidence that disputes this.

An attempt is, however, made on the part of plaintiff to show that Lamb *sat in the hind brakeman's chair* on the west side of the cupola, and uttered the accident-causing exclamation. But testimony of this sort loses what little weight it might otherwise possess by the fact that it is flatly contradicted by the testimony of Abell, Lamb and Little, all of whom were in the cupola at the time the whistle was blown, in full and unobstructed view of each other's faces, while neither plaintiff nor anyone for him would swear that those three parties were not up in the cupola when the signal was given, nor would plaintiff or his witnesses swear that they saw Lamb set the brake in the cupola, while Abell and Little both testify that it was the latter who set the cupola brake, and Abell, Lamb and Little all testify that it was the duty of Little to set that brake, and besides, it is shown by all the wit-

nesses that Lamb, immediately upon the signal being given, swung down from the cupola, and he swears that he went at once and set the coach or forward brake, as was his duty to do, and on this point he is virtually sustained by Thrall, who testifies to seeing Lamb on the passenger coach steps when the latter asked the question already related, as to what was the matter, etc. Besides that, it clearly appears from the evidence that plaintiff, Ephland and Goodenough were seated down in the caboose in a *north or northeast* direction from where the hind brakeman was sitting, who was facing *south*, and plaintiff's own petition charges that "said brakeman and *another* of defendant's employees were in the 'lookout' of said caboose car," and Thrall testifies that there were *three* trainmen up in the cupola.

As to whether some such exclamation having been made as the petition charges, and that Lamb made it, is testified to by plaintiff, Ephland and Goodenough, and though this is denied to be the case by Lamb, Little, Abell and Thrall, yet, the evidence on this point being in conflict, it would be a matter for the determination of the jury. But necessarily this statement proceeds on the supposition that Lamb not only made the exclamation *while* he was employed, but that it was done *in the course of his employment, in the furtherance of his employer's business*, and under his authority so to do, which matter is not only not proven, but positively *disproven* by the only witnesses who profess to have any knowledge of the fact. Of course it stands to reason that their positive and direct testimony as to the nature and scope of Lamb's employment could not be abated or in anywise overthrown by testimony that *Lamb sat in Little's chair*, or that he made the alleged exclamation. Otherwise corporations and other employers would be at the mercy of every intermeddling

employee, and liable for their reckless or wanton acts or ejaculations to be mulcted in unjust and unwarranted damages.

III.   But the concession may be made that Lamb had authority to make the exclamation that he is charged with making, and that it was uttered in the line of his duty, in the course, and in furtherance of his master's business, and still this would create no liability on the part of the defendant, as will shortly appear, for the following reasons: It is disclosed by undisputed evidence that there was *no real danger*, and no object within the range of vision from which danger could be apprehended, as both the advance and rear trains were out of sight; plaintiff was guilty of the grossest contributory negligence and even recklessness in taking no precaution by looking out of the windows or otherwise, before running out of the caboose and jumping off a train going at the rate of fifteen miles an hour in the opposite direction from which he jumped.

The rule in such cases is thus laid down by the court of appeals of Kentucky:   "It is urged that, when one is frightened by something resulting from the neglect of the carrier, he can not be charged with contributory neglect to any extent.   He, however, must act upon a reasonable apprehension of peril.   His conduct must conform to that of an ordinarily careful man under like circumstances.   He has no right, upon the happening of some trivial occurrence, or such as would not create fear or apprehension of injury in the mind of an ordinarily prudent and careful person, to bring injury upon himself, and then recover damages by reason of it.   This rule is sustained by both reason and precedent."   *Railroad v. Ware*, 1 S. W. Rep. 493.

This accords with the views of Lord ELLENBOROUGH in the early and leading case of *Jones v. Boyce*, 1 Stark.

493, where he said: "If the plaintiff's act resulted from a rash apprehension of danger, which did not exist, and the injury which he sustained is to be attributed to rashness and imprudence, he is not entitled to recover. * * * A coach proprietor certainly is not to be responsible for the rashness and imprudence of a passenger; it must appear that there existed a reasonable cause for alarm." See, also, announcing in effect the same principle: *Railroad v. Felton*, 33 Am. and Eng. R. R. Cas. 533; *Railroad v. Wallen*, 26 *Ibid*. 219; s. c., 65 Tex. 568; *Filer v. Railroad*, 49 N. Y. *loc. cit.* 52 and cases cited; *Railroad v. Aspell*, 62 Am. Dec. 323.

Now, upon the facts in evidence in this case, it can not be said that plaintiff was in a position of peril, either *actual* or *apparently imminent;* certainly there were no *physical signs of danger*, nor was the situation such as to arouse the fear of an ordinarily careful and prudent person. On the contrary plaintiff's act must be regarded as the result of a rash and baseless apprehension of *nonexistent* and *nonapparent* danger. Under the authorities cited, therefore, plaintiff has no ground for recovery, even if the act of the brakeman were within his delegated authority. But where, as here, there is no evidence that the servant was acting within the line of his duty and within the scope of his employment; it is wholly immaterial how wrongful or how injurious the unauthorized act of the servant may be, and it is error to submit the question to the jury, whether the act complained of was or was not done in the exercise of a duly delegated authority. *Towanda Coal Co. v. Heeman*, 86 Pa. St. 418.

In *Farber v. Railroad*, 116 Mo. 81, the principle here announced was recognized, where the lower court had sustained a demurrer to the evidence on the point mentioned, and its judgment was affirmed.

IV.   In consequence of the views already expressed, it is quite unnecessary to discuss other instructions, whether given or refused.   We, therefore, pass to the remaining point left for discussion, to wit, the calling in of the jury and the remarks made to them by the court.

The functions of the court and of the jury are necessarily separate and distinct, and so they should remain.   No encroachment should be suffered by either tribunal upon the other, for in this way is justice best administered.   This court has ever sedulously maintained the strict line of demarcation between the functions of the court and those of the jury.   Thus in *State v. Alexander,* 66 Mo. *loc. cit.* 164, it was said: "The jury are the triers of the facts, and the court has no more right to interfere with them while considering of their verdict, except in open court, to discharge them from time to time, or, in the presence of the accused and his counsel, to instruct them as to the law of the case, than the jury have to invade the province of the court."

Our statute only contemplates that the *media* of the transmission of thought between court and jury in regard to any pending cause shall be by *written* instructions, given in open court.   Revised Statutes, 1889, sec. 2188.

In *Edens v. Railroad,* 72 Mo. 212, this state of facts occurred:   "After the jury had been out several hours, they came into court and announced that they were unable to agree.   The judge then spoke to them of the time that had been consumed in the trial of the case, and discharged them until next morning, telling them: 'Gentlemen, come back to-morrow morning with a determination to compromise.'   When they came into the box   next morning the court again spoke to them of the great importance to the parties

and to the county that they agree upon a verdict, telling them orally, 'that many things juries were authorized to compromise, such as amounts; that very seldom twelve men went into the jury room with the same notions as to amounts, and compromises were necessary,' and directed them to retire and make a verdict." And the action of the trial court was condemned and the judgment for that and other causes reversed.

In the more recent case of *State v. Hill*, 91 Mo. 423, the facts in regard to the action of the trial court toward the jury were these: "The cause, after argument, was submitted to the jury at 11 o'clock Wednesday evening. Afterward, at 9:30 o'clock, Thursday morning, the jury were called into court, and inquiry made by the judge whether they had agreed upon a verdict. Receiving a negative reply, the judge addressed the jury as follows: 'Gentlemen: I will be here until 11 o'clock to-day, at which time I expect to go home, and if you agree upon a verdict against that time you will be discharged; if you can not agree by that time, court will adjourn from day to day, until such time as you may agree.' To which verbal charge to the jury the defendant excepted. The jury then retired to their room, and at 10:30 o'clock A. M. returned a verdict finding the defendant guilty." And it was there ruled that such language was made by the court to induce a verdict by the time named, and therefore improper and a ground for reversal.

In the quite recent case of *State v. Punshon*, 124 Mo. 458, the inviolability of the province of the jury was again referred to.

In *Ins. Co. v. White*, 24 S. W. Rep. 425, the facts in the case touching the point under discussion were these: "The bill of exceptions shows 'that on the morning after the jury had been permitted to separate, after having failed to agree, the court told the jury to

retire and consider of their verdict, and said to them: "If you can't each get exactly what you want, get the next best thing to it," which was excepted to, and made appellant's fifth ground in motion for new trial.'" And when the cause reached the supreme court of Arkansas, that tribunal remarked, touching this language of the trial court: "We can readily understand how the patience of trial judges may be put to crucial tests by the seeming obstinacy or obtuseness of jurors in failing to agree upon a verdict in a case which, to the judge, may appear of easy and ready solution. But nevertheless, under such circumstances, the court must suffer and endure; and, if it finds it necessary to give the jury additional instructions, let its language be circumscribed by the constitution (article 7, sec. 23), and such as not to indicate that the jury would be justified, under any circumstances, in bringing in a verdict merely for the sake of expediency. While not intended in that sense, evidently any juror might reasonably construe the above language to mean that he might yield his individual convictions of right, and agree with his fellows, for the sake of agreeing, whether his judgment was convinced and his conscience satisfied, or not. This was its most natural purport. 'The next best thing,' to some of the jurors, might have been a verdict for the appellee, when they really believed that he was not entitled to it."

In *Goodsell v. Seeley*, 46 Mich. 623, the court said: "The law contemplates that they [jurors] shall, by their discussions, harmonize their views if possible, but not that they shall compromise, divide and yield for the mere purpose of an agreement."

In *Randolph v. Lampkin*, 14 S. W. Rep. 538, the jury came in a body to the court room, and reported that there was no possibility of their agreeing, whereupon the trial judge arose from his seat and addressed

McPeak v. The Mo. Pac. R'y Co.

them as follows: "Gentlemen, how do you expect this case to be decided unless you do it? This is, as you know, the third trial of this case, and it has become an incubus upon the business of the court. * * * You must decide it. * * * It is no credit to a man, merely because he has an opinion, to stubbornly stick to it, but he should be open to argument and reason and conviction." Much more was said of the same tenor. The jury were sent back, and finally brought in a verdict. And it was held by the supreme court of Kentucky, that the use of such language was an unwarrantable interference with the province of the jury, and that the verdict should be set aside.

The remarks of the court in that case quite closely resemble those in the case at bar. Indeed, the remarks of the court in this instance are even of a more objectionable character, because evidently aimed at and addressed to *one* man, and that one who had evidently stood out against the eleven who "could get together in *about a minute*." In one hour and a half from the time of the address, a verdict was reached. On this state of facts there can be but one opinion as to the effect of the address. The juror who had stood out for what he deemed to be right surrendered his convictions, and joined the majority. Further comment is unnecessary; we can not sanction a verdict thus secured, although we do not impugn the motives of the learned judge who addressed the jury in the manner indicated. Still it is necessary that there be no invasion in any respect or in the slightest degree of the province and functions of the jury. This point alone affords a sufficient ground for a reversal of the judgment and remanding the cause, but on grounds already stated, the judgment should be simply reversed. BURGESS, J., concurs in paragraph 4 of the opinion, and the judgment is accordingly reversed and the cause

remanded. GANTT, P. J., expresses his view in a separate opinion.

GANTT, P. J. (*dissenting*).—I.   In my opinion the judgment should be affirmed.   The sufficiency of the petition is not challenged in the very able and elaborate *brief* filed for the defendant.   Although containing eighty printed pages the very able and astute counsel for defendant does not make the point that a cause of action is not stated in the petition, and in my opinion he would not have been justified in so doing.

The petition shows that plaintiff was a passenger on defendant's train at the time of his injuries.   From that relation the law cast upon defendant the duty of exercising the utmost care that a very prudent person would have exercised under the same circumstances in providing careful and prudent servants to manage its train.   The petition further charges that in the car in which plaintiff was riding was a brakeman whose duty it was to act as porter, in the passenger and caboose cars, call the stations, assist passengers on and off the cars, and give them information and assistance and look after their safety and comfort.

I entertain no doubt whatever of the correctness of the legal proposition that the act of the servant to bind his employer must be in the line of his duty to his master.   But if a petition states the relation from which the duty necessarily flows I think it is sufficient without further formal averment.

From the averments, then, of this petition it appears that defendant had placed a brakeman in its cupola or lookout in the caboose in which plaintiff was a passenger; that the brake rod extended up into this cupola and that it was the duty of the brakeman to work this brake and call stations and otherwise look after the safety of the passengers.   The petition then

avers the fact that this train was preceded by another train only a short distance and was followed by another. It avers that when about three miles from Butler, this brakeman was in this cupola and the engineer gave the signal for "down brakes;" that thereupon said brakeman instantly, excitedly, negligently and recklessly called out "Jump!" or "Jump for your lives!" and plaintiff, knowing of the train just in front and another just in the rear, started to get off of the train by the rear platform and, not being able to turn to the steps, jumped and fell to the ground and was injured.

What then is the case made on paper? A passenger is in a car in sight of a part of the necessary appliances with which the train is operated. He sees the brakeman in charge thereof in the lookout, from which it is his duty to observe and obey signals for stopping or slowing that train. A signal is given for brakes to stop the train. There is nothing in the signal itself to excite fear or apprehension of danger, but *suddenly* this servant, upon whose conduct, in part, the safety of the train must depend, instantly, excitedly and recklessly called out in the hearing of this passenger, "Jump!" "Jump for your lives!" If there was an impending collision ahead with the forward train, and from his vantage ground he could see the danger, will anyone contend it was not his duty to warn the passengers, if thereby the danger might be averted? We think most clearly the duty would be an incident of his employment. On the other hand if, in fact, there was no danger, and his position certainly enabled him to see whether there was or was not, was it not negligence for which his employer must be held liable for him to so act and so conduct himself as to needlessly alarm those passengers who had not the equal opportunity of judging whether there was danger, and can his employer now be heard to say it is not liable,

when by its own servant's conduct a passenger was induced to jump from the train in the effort to save his life? I think the very manner of performing his duty was negligent, and his master must respond for it. I do not think it is necessary to cite authority. I think the principles are settled, and I differ from my brother only in their application.

II. The evidence of plaintiff and his witnesses fully sustained the petition. It is true there was a conflict between defendant's witnesses and plaintiff's on this point, but that was a question of fact and veracity which was properly left to the jury, and there was no such failure of evidence as would have justified the circuit court it taking the case from the jury upon the demurrer to the evidence.

III. Nor can I concur in the view that, although Lamb, the brakeman, had authority to make the exclamation, "Jump for your lives!" and that it was uttered in the line of his duty, in the course and furtherance of his master's business, still no liability would attach to his employer, *because there was no real danger*. The plaintiff was in the caboose, the rear car of the train, and his conduct must be measured by his opportunity to see and judge whether there was imminent danger. That he could not, from the interior of this caboose, see ahead, and know what the brakeman in the cupola, or the engineer who gave the signal, did, is very evident; there was, then, no equality as to their means of knowledge and observation.

Under these circumstances this alarm was given, and in direct and immediate connection with the call for brakes. Now I understand the law of this state to be that if one is placed in a position of peril by the recklessness or negligence of one who owes him the duty of safely carrying him, the propriety of an attempt on his part to escape apprehended danger is not to be

measured by the judgment and discretion that would be required of him when not dominated by terror of impending danger. The defendant having wrongfully excited his fears can not now be heard to say that plaintiff was guilty of negligence in adopting the dangerous alternative which the defendant's own servant urged him to take. *Siegrist v. Arnot*, 86 Mo. 200; *Adams v. Railroad*, 74 Mo. 554; *Kleiber v. Railroad*, 107 Mo. 240.

In this last case it was said: "If, without having time to deliberate and act upon the instinct of self-preservation, and as a prudent person might be expected to act in the circumstances, he is injured by adopting a dangerous alternative, he may still recover from the one by whose negligence he has been impelled to act. *This is true though no injury would have resulted had no attempt to escape been made.*" *Bischoff v. People's R'y Co.*, 121 Mo. 216; *Coulter v. Express Co.*, 56 N. Y. 585.

I think it was a question for a jury to say whether a reasonably prudent man would not have jumped from that train when urged to do so by the servant in charge of the brake, who occupied a position from which he could readily discover danger, when they took into consideration the construction of a caboose, the signal for brakes, and that the urgency of the cry left no time for deliberation. I do not think this court should declare as a matter of law that the plaintiff's conduct was so unreasonably rash that he can not recover because his fears had been needlessly aroused by defendant's servant in charge of the appliance for stopping the car. *Three out of the four passengers were so alarmed* that they jumped. On this point I fully concur in the opinion of the Kansas City court of appeals in *Ephland v. Railroad*, 57 Mo. App. *loc. cit.*

163, an action for injuries to another passenger who jumped from this train when plaintiff did.

IV. I do not think the remarks of the circuit judge were so prejudicial as to constitute error. The court, I think, was moved simply by a desire to ascertain if there was any probability of reaching a verdict. He evinced no desire to force the jury into a verdict, and I think his remarks fall far short of a reproof of the one juror. I do not think his statement calls for a rebuke, much less a reversal.

Judge BURGESS concurs in my views except as expressed in paragraph IV; as to that he concurs with Judge SHERWOOD, holding the conduct of the circuit judge to be error.