THE CHICAGO, ROCK ISLAND AND PACIFIC RAILWAY COMPANY

*v.*

E. W. FELTON, Admr.

*Filed at Ottawa June 16, 1888.*

1. NEGLIGENCE—*giving signal of danger—as causing passenger to leave a place of safety.* Where the giving of a signal, by the whistle of an engine, is a proper one under the circumstances of the case, there can be no negligence in giving the same; and if a passenger be frightened thereby, and in consequence thereof leaves the car on which he has taken passage and runs upon another track, where he is injured, without the fault of the company, no recovery can be had for the injury.

2. In order to render a railway company liable for a personal injury to a passenger, caused by his alarm and apprehension of danger leading him to leave a place of safety for one of peril, it is not sufficient, merely, that he became alarmed by reason of appearances produced wholly or in part by the company, but it must appear that that which produced the alarm, and through it the injury, was negligence of the company or its servants. The burden is upon the plaintiff to prove this negligence.

3. INSTRUCTION—*assuming facts as being proven.* In an action against a railway company to recover for a personal injury to a passenger from negligence, an instruction which assumes that there was evidence tending to prove that defendant's servants negligently gave an alarm signal by blowing an engine whistle, when in fact there was no such evidence, is erroneous.

APPEAL from the Appellate Court for the Second District;—heard in that court on appeal from the Circuit Court of Will county; the Hon. GEORGE W. STIPP, Judge, presiding.

Late on Saturday night of March 19, 1881, the Chicago, Rock Island and Pacific Railway Company started a train, consisting of a sleeper, passenger car and baggage car, to pass on its road from Bureau Junction to Chicago. There was at the time a violent storm of wind and snow, which had begun some twenty-four hours earlier. The storm had at some points so obstructed the railway track by drifting snow, as to prevent the passage of cars, and all regular trains had, in consequence

of the storm, been much delayed. The train arrived at Ottawa near two o'clock on the morning of Sunday, the 20th, and at that place Luke H. Goodrich and William Maltby got in the passenger car to go to Joliet. From Ottawa to Chicago there is a double track, being used, generally, that on the south side for trains passing east, and that on the north side for trains passing west. The train proceeded from Ottawa east, on the south track, to Morris, where House and Marshall, intending to go to Joliet, and perhaps others, entered the passenger car. At Morris there was a snow-plow that had been passing eastwardly on the south track, but which had gotten off the track so far as to prevent present passage by that track, and on that account the train was there switched on to the north track, and it then passed on eastwardly. About a mile west of Minooka, which is the next station east of Morris, the train ran into a snow bank, which stopped its passage. Trains had passed on that track late on the evening before, and it is hence to be inferred that the obstructing snow bank was piled up by the storm after that time. Whether Goodrich knew that the train had taken the north track, and left the snow-plow on the south track at Morris, does not appear, but it does appear that Maltby, who got in the passenger car with him at Ottawa, knew it, and that House and Marshall, who got in that car at Morris, knew it. Maltby testified, when recalled for further cross-examination: "I understood, at Morris, that our train switched off on to the other track. I think I got that understanding from the conductor in coming in the train. I understood that the snow-plow was off at that time, on the other track, and I understood from the conductor that that was the reason we took the other track coming through." Maltby had previously said that Goodrich sat behind him in the car,—he could not recollect whether one or two seats. House testified: "After I got aboard of the train, the train backed off, and switched over on the other track, and proceeded towards Chicago; that would be the north track, or left hand track coming this way,

and the right hand track going west. At that time the snow-plow was on the track, up near the water-tank." Marshall testified: "I knew, at Morris, that this train was going to take the north track. I heard the conductor say so. I did not hear him aboard the train, but heard it before I got on board. I heard him talking about it to the engineer, and I knew the snow-plow was off the track there, and it was on the track ahead, and would have to get on again. * * * I knew, at Morris, that if the snow-plow, which was the very one that subsequently passed us on the south track, got on the track, it was going to take the south track."

Not long after the train was stopped by the snow bank, House, who had been seated in the front end of the car, arose and passed down the aisle, by Goodrich and Maltby, to the rear end of the car, and thence out on to the steps at the rear end of the car. As he passed by Goodrich and Maltby he attracted their attention by some remark, and they then both arose and followed him. House, when on the steps, looked by the sleeper, to the rear, in the direction of Morris, and saw what he thought to be the head-light of an engine, coming right into the rear end of the train. Goodrich preceded Maltby, and looked in the same direction in which House had looked, and Maltby, reaching over the shoulders of Goodrich, also looked in the same direction, and he saw what he supposed was an engine coming into the rear end of the train. House immediately turned and re-entered the car. As he did so, he remarked, "My God, gentlemen! the snow-plow is coming into us!" About the same time, one of the engines in front of the passenger train gave what Maltby, House and Marshall understood to be a whistle of alarm. House testified: "They were sharp, quick whistles, * * * signals of danger." Maltby testified: "While standing on the platform I heard the engines in front of our train whistling." And on being asked what sort of whistles they were, he answered, "whistles of alarm." Marshall testified that he had got off the train

on the south side, after it stopped, and gone forward toward the engines; that he heard a remark, not loud enough, however, to have been heard by Goodrich, to the effect, "it's running into us," which caused him to turn around; that he looked back, and saw the headlight of the engine to which the snow-plow was attached,—it looked as if it was coming directly into the train; that he then stepped up to the car to notify the conductor, and as he did so he heard from one of the engines a sort of sharp, quick signal, which he understood to be a danger signal. Marshall says there was one passenger,—a young gentleman from Minooka,—with him. There was also, besides, on the ground on the south side of the train, and on or near the south track, a brakeman and some other train-men. There is no other evidence in regard to the whistle of the engine. There is nothing explaining its purpose, or the meaning of such a whistle, any further than as has been quoted.

Immediately after House re-entered the car, and after the whistle from the engine in front, Goodrich and Maltby jumped from the steps to the ground, intending, as Maltby testified, to cross to the bank south of the south track, but advancing parallel with, instead of directly across, the track. The evidence also shows, that about the time, or perhaps a few moments earlier than they jumped, some train-men rushed from near the engines to the bank south of the south track, and that this was observed by Maltby. There is no explanation of what induced them to do so, and it is not shown that either of them had any care over the passengers in the train. The inference is that they were seeking to avoid danger from the advancing snow-plow. Maltby and Goodrich, just after alighting, were caught by the snow-plow, which rushed by at a rapid speed, and Goodrich thereby received wounds of which he died on the Monday night next following.

One of the witnesses describes the place where the obstructing snow bank was, as a "cut," but the depth is not stated. He describes the snow as "banked up" on the north side of the

track as high as the car, but said it was not very deep on the south side. The road curves, at a point a short distance west of the obstruction, to the south, and it is therefore impossible for a person looking from the point of obstruction westwardly, to tell whether a car beyond the commencement of this curve is upon the one track or the other. Snow was falling and a strong wind was blowing from the north or north-west, at the time. The hour must have been not far from three o'clock in the morning. No one who remained in the passenger car was in any degree injured, or even frightened. The snow-plow threw a large quantity of snow as it advanced, and this snow falling against the windows, knocked in one or two, but did no other injury. There is no evidence that any of the railroad employes had any knowledge of the existence of the snow bank until the train ran into it, and there is no evidence that those in charge of the snow-plow knew that the train was delayed there, until after they passed it.

The declaration contains two counts. The negligence alleged in the first is, that the servants of the defendant so negligently and carelessly managed "the said locomotive engines and the said snow-train and passenger train, that the said snow-plow, in passing, with great velocity, the passenger train then standing on an adjoining track, ran upon, struck and caught up the said Luke H. Goodrich, then and there being a passenger, * * * and while exercising due and reasonable care and prudence to avoid danger, and threw him, * * * with great force and violence, upon the ground and against the side of one of the passenger cars," etc. The negligence is thus stated in the second: "And whereas, at the time and place aforesaid, the passenger train whereon the said Goodrich was a passenger, was standing still upon the north or west-bound track, by reason of the obstructions of snow thereon, and in a cut which, by reason of a precipitous wall or bank of snow on the north side of said track and closely approaching the same, made any escape from the cars in which said Goodrich was

being conveyed as aforesaid, impossible to a passenger therein in case of occasion to attempt the same; and whereas, at the time and place aforesaid, while the said passenger train, which was bound east, was so standing upon said west-bound track, and the said Goodrich was so being conveyed as a passenger therein, the said snow-train or locomotive engine, with snow-plow attached, coming from the west on the south or east-bound track, with great velocity, passed the place where said passenger train was standing, being for the time being obstructed by the snow; and whereas, from the darkness of the night and falling snow the said Goodrich was unable to discern objects at a distance, and by reason of a curve in said railroad was unable to see whether said snow-train was approaching on the north or south track, and thereby becoming terrified and alarmed, as well by the apparent direction of approach of said snow-train as by the signal of danger sounded by the servants of said company by a prolonged blast from the whistle of one of said locomotive engines to which said passenger train was attached, then and there sought to escape from the supposed danger of collision between said trains by crossing over the south or west-bound track, the said defendant, by its servants and agents, then and there so negligently, ignorantly and un-skillfully managed said engines, and with such want of con-cert and knowledge between the servants of said company managing said trains, respectively, that the said Goodrich was struck with great violence by said snow-plow, and was thrown and flung by the impetus of the same, upon the ground and upon and against the side of one of the cars forming said passenger train, whereby he received mortal injuries to his person, because of which he afterwards, on the 22d day of March, 1881, died; that the said Goodrich, in leaving said passenger car in the manner and at the time and place afore-said, exercised reasonable care and diligence to apprehend and escape said apprehended and apparent danger of col-lision."

The court, at the instance of the plaintiff, gave the following among other instructions to the jury:

"5. If, from the evidence, the jury believe that the engineer in charge of one of the engines attached to the passenger train, either from ignorance of the character of the approaching train, or any other cause, sounded signals of alarm such as are usually given to avoid collision on the track, and that the effect of these signals of danger was to produce fright amongst the passengers, or some of them besides the deceased, while within the passenger car, and that immediately afterwards one or more of the employes of the defendant fled across the track with precipitation, followed by one or more of the passengers, as if to avoid danger, or in such a way as to naturally produce that impression on the mind of Goodrich, and that this conduct on the part of said engineer or other employes of the defendant, to the satisfaction of the jury, was the immediate and proximate cause of the effort of said Goodrich to seek safety in the same direction, if the jury believe, from the evidence, he made such effort, such facts may be weighed in conjunction with all the other evidence in the case in determining the question of the alleged negligence on the part of the defendant, even though the jury may further believe, from the evidence, its employes were themselves deceived by a false and misleading appearance of danger."

Mr. Thomas F. Withrow, Mr. James C. Hutchins, and Messrs. Snapp & Snapp, for the appellant:

To enable the plaintiff to recover when the danger was apparent, not real, the deceased must have been placed by the negligence of the defendant in such a situation as obliged him to adopt the alternative of taking a dangerous step instead of remaining at certain peril. *Jones* v. *Boyce,* 1 Starkie, 189; *Stokes* v. *Saltonstall,* 13 Pet. 181; *Railroad Co.* v. *Green,* 81 Ill. 19; *Railroad Co.* v. *Coultas,* 67 id. 398; *Frost* v. *Railroad Co.* 10 Allen, 387; *Hickey* v. *Railroad Co.* 14 id. 429; *Commonwealth* v. *Railroad Co.* 129 Mass. 500.

The proper place for a passenger is his seat, and a voluntary abandonment thereof subjects the passenger, and not the carrier, to the responsibility of the consequences. *Pennsylvania Co.* v. *Zebe*, 33 Pa. St. 318; 37 id. 420; *Railroad Co.* v. *Clemmens*, 8 Am. & Eng. Ry. Cas. 396; *Stiles* v. *Railroad Co.* id. 195; *Railway Co.* v. *Miles*, 13 id. 10; *Railway Co.* v. *Hawk*, 18 id. 194; *Quinn* v. *Railroad Co.* 51 Ill. 495; *Merrill* v. *Railroad Co.* 139 Mass. 238; *Railroad Co.* v. *Lane*, 83 Ill. 449; *Abend* v. *Railroad Co.* 111 id. 202; *Railroad Co.* v. *Slatton*, 54 id. 137; *Railway Co.* v. *Scates*, 90 id. 586; *Taylor* v. *Railroad Co.* 10 Bradw. 311; *State* v. *Railway Co.* 58 Me. 176.

The fifth of appellee's instructions is not based on any evidence in the record, and this is error. *Railway Co.* v. *Robinson*, 106 id. 142; *Railway Co.* v. *Lewis*, 109 id. 125.

Mr. G. D. A. Parks, and Mr. C. W. Brown, for the appellee:

As to how far mistakes growing out of the fright or folly of the party injured can be regarded in the light of contributory negligence, see Wharton on Negligence, sec. 304; *Coal Co.* v. *Healer*, 84 Ill. 129; *Morse* v. *Sweenie*, 15 Bradw. 491; *Coulter* v. *Express Co.* 56 N. Y. 585.

A party having given another reasonable cause for alarm, can not claim that the person so alarmed has not exercised cool presence of mind, and thereby find protection from liability. *Coal Co.* v. *Healer*, 84 Ill. 129; *Railroad Co.* v. *Yarwood*, 15 id. 471; *Railroad Co.* v. *Able*, 59 id. 131; *Railroad Co.* v. *Carr*, 35 Ind. 510; *Stokes* v. *Saltonstall*, 13 Pet. 191; Wharton on Negligence, secs. 93, 94, 304, 375, 377; *Schultz* v. *Railway Co.* 44 Wis. 644; *Gumz* v. *Railroad Co.* 52 id. 672; *Railroad Co.* v. *Becker*, 76 Ill. 25; *Lund* v. *Inhabitants*, 11 Cush. 567; *Caswell* v. *Railroad Co.* 98 Mass. 204; *Trowley* v. *Railroad Co.* 69 N. Y. 158; *Buell* v. *Railroad Co.* 31 id. 318; *Iron Co.* v. *Mowery*, 36 Ohio, 418; *Railroad Co.* v. *Pault*, 24 Ga. 356; *Filer* v. *Railroad Co.* 68 N. Y. 124; *Baley* v. *Railroad Co.* 125 Mass. 63.

A case where plaintiff, in crossing a railway, acted upon a misleading signal of the gate-keeper: *Sweeney* v. *Railroad Co.* 10 Allen, (Mass.) 376.

Cases of plaintiff misled by flagman: *Copley* v. *Railroad Co.* 136 Mass. 9; *Warren* v. *Railroad Co.* 8 Allen, 233; *Railroad Co.* v. *Sykes*, 96 Ill. 175; *Railroad Co.* v. *Harmon*, 47 id. 307.

Mr. Justice Scholfield delivered the opinion of the Court:

Since the right of recovery here is based upon the negligence of the defendant, it is not sufficient merely that plaintiff's intestate became alarmed by reason of appearances produced wholly or in part by the defendant,—it must appear that that which produced the alarm, and, through it, the injury, was negligence of the defendant. The burden is upon the plaintiff to prove this negligence, and that is not done by proof, alone, that a peculiar signal was given by an engine of the defendant, and that it caused or aggravated the alarm of the intestate. If the signal given was, under the circumstances, a proper one, it can not have been negligence to give it.

The instruction quoted in the preceding statement, assumes that there was evidence before the jury tending to prove that the defendant's servants negligently gave an alarm signal by blowing an engine whistle. There is no such evidence in the record. As will be seen by reference to the facts in the preceding statement, the only evidence in regard to the blowing of an engine whistle is, that an alarm whistle was blown, or, as one phrases it, "a danger signal" was given by the whistle. There is an entire absence of evidence of the purpose of giving signals by the whistle, for whom they were intended, and the results they were expected to produce. Nor is there any evidence tending to show that the signal here was unnecessarily given.

If we are left to take judicial knowledge of the purpose of giving signals by the whistle, then we know that they are not intended for the passenger on the train at all. They are for those operating the road, and to notify those who, but for the

signal, might come in collision with the train, of its presence. Communications are ordinarily made with passengers, in regard to matters affecting them personally, by the conductor, more rarely by porters or other employes; but the passenger is never required to understand and heed any signal given by the whistle of the engine. No witness testified, as this instruction assumes, that the signal given was such as is usually given "to avoid collision on the track." If those in charge of the engine apprehended injury to the cars, or to the other property of the company, or to the passengers or train-men on or near the south track, by the too rapid movement of the snow-plow, it was not only prudent, but it was their duty, to give a danger or alarm signal by the whistle to those in charge of the snow-plow, so that they might moderate its speed; and since, from all the evidence, it is apparent that those in charge of the train knew that the snow-plow was on the south track, and hence that there could be no collision, it is much more reasonable to infer that this was its purpose than that it was to avoid a collision.

It is not charged in the declaration that the train on which plaintiff's intestate was riding, was through negligence upon the north track, and there is no evidence tending to sustain such an allegation had it been made; and it is clear, beyond all question, that the running into the snow bank was the result of an inevitable casualty. It is not claimed that the curve in the road, the darkness of the night, or the violence of the storm, can be regarded as evidence tending to establish negligence, and hence the jury must have accepted the fact that the whistle blew an alarm, as conclusive proof of negligence, and the giving of this instruction was therefore error.

The judgments of the circuit and Appellate courts are reversed, and the cause is remanded to the circuit court for a new trial. The clerk of this court will tax the costs made in the Appellate Court against the appellee, upon certificate of the amount to be filed by the clerk of the Appellate Court.

*Judgment reversed.*