J. H. BEATY v. MISSOURI, KANSAS & TEXAS RAILWAY COMPANY
OF TEXAS ET AL.

Application No. 9342.   Motion No. 3658.   Decided April 19, 1916.

Negligence—Contributory Negligence—Proximate Cause—Carrier of Passengers—Question of Fact.

Plaintiff, a passenger on a railway train, alarmed by the approach of a train of another road upon a track parallel with his own and anticipating a

collision, sprang from the window of the moving car and was injured. Alleging that negligence of both roads caused his injury by producing an appearance of danger, he was denied a recovery, by peremptory instruction. On motion for rehearing on his application for writ of error, overruled per curiam, without written opinion, Mr. Justice Hawkins dissents, holding negligence, contributory negligence, and proximate cause to be questions of fact, in the state of the proof, and a peremptory instruction unwarranted. (Pp. 83-95.)

Motion for rehearing on a refused application for writ of error to the Court of Civil Appeals for the Third District, in an appeal from McLennan County.

Beaty sued the Missouri, Kansas & Texas and the Cotton Belt railways for injuries received while a passenger on the train of the former. A peremptory instruction in favor of defendants was given on the trial. Beaty appealed, and on affirmance (175 S. W., 450) applied for writ of error. The writ was refused *per curiam,* without written opinion, on April 5, 1916. Motion for rehearing was overruled *per curiam,* and without written opinion, on April 19, 1916, Mr. Justice Hawkins dissenting.

*James E. Yeager,* for petitioner.

*Allan D. Sanford* and *W. E. Spell,* for appellees.

MR. JUSTICE HAWKINS delivered the following dissenting opinion on the overruling of applicant's motion for rehearing on his petition for writ of error.

The following statement of this case is from the opinion of our Court of Civil Appeals for the Third Supreme Judicial District, 175 S. W., 450:

"The Missouri, Kansas & Texas Railway Company of Texas, hereinafter called the Katy, on the 20th day of April, 1913, ran an excursion train from Waco to Dallas, and return, upon which appellant was a passenger. On the return trip, a short way out from the Katy depot, that company's track approaches within a short distance of the track of the St. Louis Southwestern Railway Company of Texas, hereinafter called the Cotton Belt; and thence for some distance these tracks parallel each other. On the evening in question, just as the Katy going south out of Dallas, upon which appellant was riding, reached the point where said tracks began to run parallel, a Cotton Belt train from the west was seen coming into the city, and the two trains appeared as though they might run into each other, while as a matter of fact they could not do so. Appellant, laboring under the belief that the danger of collision was imminent, jumped from the window of the car in which he was riding to the ground, sustaining serious injury from the fall; and this suit is brought by him against both companies to recover damages therefor, alleging (1) that they negligently built and maintained their tracks in and along the streets of Dallas in such close proximity to each other as to create in the minds of passengers on trains running

over said tracks the impression that there was great apparent danger of a collision; (2) that appellees were negligent, after discovering his peril, or after they should have discovered it by the use of ordinary care and diligence, in failing or refusing to stop or slow down their trains, or either of them; (3) that appellees negligently and rapidly blew their whistles, as if to give warning of approaching danger; (4) that the Katy was negligent in starting and continuing to run its train when it knew, and could by ordinary care have known, that a Cotton Belt passenger train was due to pass there at about right angles with it, and was then coming in at a great rate of speed and in plain view; and (5) that appellees were each guilty of negligence in operating their trains faster than seven miles per hour, in violation of the speed ordinance of the city of Dallas."

"Appellees answered, denying generally and specifically each allegation of negligence charged against them; and likewise plead contributory negligence on the part of appellant."

"There was a jury trial, and the court peremptorily instructed a verdict against appellant, upon which judgment was rendered, from which this appeal is prosecuted, and such ruling is assigned as error."

As to the "Katy," the issue relating to the blowing of its whistle was abandoned.

Said opinion concludes thus:

"We hold that the evidence fails to show that appellees were guilty of any negligence which was the proximate cause of the injury in question; and believing that appellant was guilty of contributory negligence, we conclude that the trial court ruled correctly in instructing a verdict in favor of appellees, for which reason its judgment is affirmed."

Beaty's application for a writ of error having been refused by this court, he now moves for a rehearing, insisting that the pleading and the evidence present a case which should have been submitted to the jury. Upon a more thorough consideration of the record than I gave to it upon the original hearing I now believe that, by a narrow margin, the case is, indeed, one for a jury.

A careful study of the evidence, as set out in the record, and of said opinion, has impressed my mind with the idea that the members of the intermediate appellate court, although usually very careful and accurate, may have decided this case under some misconception of the actual facts involved.

For instance: With reference to plaintiff's knowledge or want of knowledge, at the time of the accident, of physical conditions at and surrounding the scene of plaintiff's injuries—an important feature of this case—said opinion said:

"There was testimony showing that he had lived in Dallas and was familiar with the tracks in question, and knew of his own knowledge to whom they belonged; knew that they were separate tracks; knew which was the Cotton Belt and which was the Katy, and had ridden on the Cotton Belt and knew where the respective depots were, and that the Cotton Belt passed some distance from the Katy depot going south

to its own; but it is not clear whether he knew of these conditions before or after the accident."

Yet, at two pages further on, said opinion, in referring to Beaty, said: "He . . . knew, it seems, of the situation and condition existing at the place where the accident occurred." And that was said, although plaintiff testified, "I lived in Dallas about three months after the injury," and also testified, positively and unequivocally, with reference to the moment and scene of said accident, "I was not familiar with those road crossings before, no, sir," and although it is the well settled law that in determining whether a case should be submitted to a jury or not all evidence except that which is favorable to plaintiff should be discarded from consideration and that point determined upon such remaining evidence alone. International & G. N. Ry. Co. v. Vallejo, 102 Texas, 70, 113 S. W., 4; Wininger v. Ft. Worth & D. C. Ry. Co., 105 Texas, 56, 143 S. W., 1150; Cartwright v. Canode, 106 Texas, 507, 171 S. W., 696; Boyd v. St. Louis S. W. Ry. Co., 101 Texas, 411, 108 S. W., 813; Wallace v. Southern Cotton Oil Co., 91 Texas, 18, 40 S. W., 399. See, also, dissenting opinions in Marshall & E. T. R. Ry. Co. v. Petty, 180 S. W., 105, and First State Bank of A. v. Jones, 183 S. W., 874, recently decided by this court. In another case, the author of the above mentioned opinion in this case tersely said: "Where there is any evidence upon an issue raised by the pleadings, it is the duty of the court to submit the issue to the jury. Citizens Ry. Co. v. Griffin, 49 Texas Civ. App., 569, 109 S. W., 999, citing numerous cases.

Again, said opinion declared: "The cars were sixty feet apart when he jumped," and there is, indeed, evidence to that effect; but there is, also, evidence to the effect that said distance was much less.

Beaty testified: "The Cotton Belt train comes within about nine feet of the Katy track at the place where I fell off," and Lipman testified, "I guess the Cotton Belt train was fifteen or twenty feet from the Katy train when Mr. Beaty jumped," and Yeager testified, "The roads were about nine feet apart."

The following phases of the evidence, which are not shown, in detail, in said opinion, should be kept in mind:

As to proximity of the tracks of the two railways:

Beaty testified: "As far as I remember the train was twenty minutes late of leaving. . . . The Katy kind of curves. The Cotton Belt runs right angling. . . . The Katy approaches the Cotton Belt road, it was running toward the Cotton Belt road. The Katy appeared that it was going across the Cotton Belt road. I was watching this Cotton Belt train. . . . The Cotton Belt train comes within about nine feet of the Katy track at the place where I fell off. . . . I waited until they got pretty close, and it looked like they were going to cross. . . . At the time I jumped it looked like one was going to hit the other."

Van Zandt testified: "I was on the Katy train. . . . As those trains approached each other they seemed to run not exactly parallel, but it seems as though the Katy track was going across this other track."

Lipman testified: "The tracks were about four or five feet apart. I did not measure it. That is really guess work. . . . I guess the Cotton Belt train was fifteen or twenty feet from the Katy train when Mr. Beaty jumped."

Craven testified: "I was about the second coach back from where Mr. Beaty was when he jumped out of the coach. I made the remark to the boy on the seat that that train looked like it was going to run into this one. . . . From where I sat it looked to me like the Cotton Belt would strike the Katy about two coaches in front of me. It looked like it would strike about where he was" (referring to plaintiff).

Yeager testified: "The Cotton Belt is coming in this direction, for instance, at right angles with the Katy, until they come within about nine feet of each other, or two blocks from the depot. They then turn and run parallel with each other. The roads were about nine feet apart, as I measured it."

As to exceeding the speed limit.

The speed limit fixed by the city ordinance was seven miles per hour.

As to the Katy:

Lipman testified:: "The Katy, I guess, was going ten or twelve miles an hour, coming toward the Cotton Belt I suppose." Craven testified: "The Katy was moving, I judge, about ten miles an hour." Beaty testified: "This train was running more than seven miles per hour."

As to the Cotton Belt:

Beaty testified: "In my opinion that Cotton Belt train was running about thirty-five miles an hour." Lipman testified: "I guess the Cotton Belt was going about thirty-five miles an hour." Slauter testified: "The Cotton Belt that day was running, I would judge, about thirty-five miles an hour." Tomlinson testified: "It was running about thirty, not over thirty-five, miles an hour."

As to the blowing of the whistle by the Cotton Belt. Beaty testified: "I could see the Cotton Belt train coming about three or four blocks away. I was blowing its whistle rapidly." Tomlinson testified: "It give two shrill whistles."

Additional facts and circumstances are reflected thus by testimony of passengers on that Katy train: Yeager testified: "The Cotton Belt and the Katy and the other roads have regular published time tables by which they go, leaving and arriving at different stations and at Dallas, Texas." Beaty testified: "The Katy appeared that it was going across the Cotton Belt road. I was watching this Cotton Belt train. This train was running rapidly. . . . At the time I jumped it looked to me like one was going to hit the other, and that was the sole reason I jumped. . . . At the time I jumped I was sitting about the second window from the back end of the coach. . . . At the time of the approach of that train the passengers were moving in the car; some looked like they were trying to get out, and some were running from one end of the car to the other, trying to leave the coach." Slauter testified: "As we pulled out from Dallas and was coming

around the curve sorter I looked out, I didn't see it, but Vernon Stargen he told me to look up and I looked. The Cotton Belt was coming this way (indicating), and he started to jump out of the window and I caught him. Vernon Stargen was with me. He is now dead. He started to jump out of the window and I pulled him back. When I looked out of the window I saw this man laying between the Katy and Cotton Belt." Tomlinson testified: "This other train (Cotton Belt), on the other side was coming around parallel to this train, and it give two shrill whistles, we were all looking out of the window. It looked like this train was coming around. It was coming fast, and this train was going slow. As the Katy crossed this track it came around and looked like it was going to hit this train. About the time this shrill whistle come we all tried to get out. I think Mr. Beaty went out through the window; I went to the back door. When I saw the other train it was right after the whistle, it must have been a block or a little over a block, about five coaches behind, or six. . . . I saw Mr. Beaty in the window, that was the last I saw him. . . . When he was in the window, I looked out and I made for the back door. I was trying to get out; there was a regular commotion in there."

At the time of the accident Beaty was a minor, nearing his majority. There was much other evidence which need not be set out here.

The evidence shows, and, as we have seen, said opinion itself declares, that Beaty jumped "just as the Katy going south out of Dallas, upon which appellant was riding, reached the point where said tracks began to run parallel," and that "the two trains appeared as though they might run into each other."

The following, also, is from said opinion:

"Before appellant was entitled to recover, it became necessary for him to show by preponderance of the evidence, first, that he was injured on account of the negligence of appellees; and, second, it must appear that he was not guilty of contributory negligence. Even if appellees had been guilty of negligence which was the proximate cause of his injury, still, if it had been shown that he was guilty of contributory negligence in jumping from the train, then he would not be entitled to recover; and this is true, whether his right of action is predicated upon real or apparent danger. If upon the conclusion of the trial it appeared from the evidence, either that appellees were not guilty of negligence, or that appellant was guilty of contributory negligence, and that reasonable minds could not differ with reference thereto, then it was the province and duty of the court to direct a verdict in favor of appellees. These rules of law are elementary, and it is not deemed necessary to cite authority in their support."

The difficulty lies in applying the law to the facts.

Certainly the established fact that there was no actual danger to Beaty does not constitute a full and sufficient defense to his suit.

Even though no actual danger to him exists a passenger may recover from a railway company for injuries resulting from his jumping from a moving train because of the reasonable appearance of immediate

danger to him, provided such appearance of danger be the proximate result of negligence on the part of the railway company or its servants.

The applicable rule has been stated thus by our Supreme Court:

"If the railroad company was without fault, then it could not be held liable whether the injured persons acted prudently or rashly, because it had not placed them in the situation of danger. If, however, the railroad company was guilty of negligence in not giving the signals, by which the deceased were caused to be in danger, then, whether they acted wisely and cautiously, or otherwise, it is liable, because it is responsible for the circumstances which produced the action on their part," citing cases. . . .

"If the standard by which the conduct of the imperiled party is to be judged is to be that which a person of ordinary prudence might be expected to do under like circumstances, how can it be determined what a man of prudence would do under such conditions? A jury is presumed from their knowledge of men and their affairs in ordinary transactions to know what a man of ordinary prudence would do under a given state of facts; but when prudence itself is destroyed and judgment yields to sudden impulse, when there is neither time nor capacity to reflect, how can anyone say what a man, prudent under ordinary circumstances, would do if he should be so situated? The rule is sound and just which holds the party guilty of negligence responsible for the result, if that negligence has caused another to be surrounded by such circumstances as to him appear to threaten the destruction of his life or serious injury to his person, whether that person be prudent or imprudent, if in an effort to save his life he makes a choice of means from which injury results, and notwithstanding it may turn out that if he had done differently, or had done nothing, he would have escaped injury altogether." International & G. N. Ry. Co. v. Neff, 87 Texas, 309, 28 S. W., 286.

See, also: Gulf, C. & S. F. Ry. Co. v. Wallen, 65 Texas, 568; Texas & P. Ry. Co. v. Watkins, 88 Texas, 20, 29 S. W., 232; Jackson v. Galveston, H. & S. A. Ry. Co., 90 Texas, 372, 38 S. W., 745; Missouri, K. & T. Ry. Co. v. Rogers, 91 Texas, 52, 40 S. W., 956; Louisville, N. A. & C. Ry. Co. v. Lucas, 119 Ind., 583, 6 L. R. A., 195, 21 N. E., 968; Kleiber v. People's Ry. Co., 107 Mo., 240, 14 L. R. A., 613, 17 S. W., 946; Houston & T. C. Ry. Co. v. Byrd, 61 S. W., 147; Elliott on Railroads, 2 ed., vol. 3, sec. 1173, and cases cited; Hutchinson, Carriers, 3rd ed., sec. 1223, citing numerous English and American cases.

In a somewhat similar case, which was submitted to the jury, the Supreme Court of Arkansas, in affirming a judgment for the plaintiff, repudiated the contention of the railway company to the effect that it was not liable in that "the precaution used by it was sufficient to prevent a collision, and the fact was that the appellee would not have been hurt if he had remained on the train." That court, through Battle, J., said, with reference to railway companies:

"The first and most important duty incumbent on them is to provide for the safety of their passengers. To this end they are required

to provide all things necessary to their security reasonably consistent with their business, and 'appropriate to the means of conveyance employed by them,' and to exercise the highest degree of practicable care, diligence, and skill in the operation of their trains. Arkansas M. R. v Canman, 52 Ark., 517. If they recklessly, unskillfully, or negligently operate their trains, and thereby place their passengers in situations apparently so dangerous and hazardous as to create in the minds of the passengers reasonable apprehensions of peril and injury, and thereby excite alarm, and induce them to make efforts to escape, and in the attempt to escape they receive personal injuries, the railroad companies are responsible for damages. Jones v. Boyce, 1 Stark., 493; Stokes v. Saltonstall, 38 U. S. (13 Pet.), 181, 10 L. Ed., 115; Caswell v. Boston & W. R. Corp., 98 Mass., 194 [93 Am. Dec., 151]; Twomley v. Central Park, N. & E. R. R. Co., 69 N. Y., 158 [25 Am. Rep., 162].

"In order to render the railroad company liable for injuries received in an effort to escape an apprehended danger, there must have been a reasonable cause of alarm, occasioned by the negligence or misconduct of the company. If the effort of the passenger to escape resulted from a rash apprehension of danger which did not exist, and the injury which he sustained is to be attributed to rashness and imprudence, he is not entitled to recover. But if, on the other hand, he be placed, through the negligent or unskillful operation of its trains by the railroad company, in a situation apparently so perilous as to render it prudent for him to leap from the train, whereby he is injured, he will be entitled to recover damages, although he would not have been hurt if he had remained on the train.

"On occasions where a passenger is suddenly confronted by imminent danger and peril, he can not reasonably be expected to calculate chances, or to deliberate upon the means of escape, but must of necessity judge hastily of the danger in remaining where he is, as also of the danger in attempting to escape, by the circumstances as they, at the instant, appear to him, and not by the result. He acts upon the probabilities as they appear to him, and if he acts as a man of ordinary prudence, 'placed in the same circumstances and under a like necessity of immediate action and decision,' would have acted, and in so doing makes an effort to escape and is injured, the railroad company is responsible to him for his damages. See cases above cited and Wilson v. Northern Pac. R. Co., 26 Minn., 278." St. Louis & S. F. Ry. Co. v. Murray, 55 Ark., 248, 18 S. W., 50, 59 Am. St. Rep., 32, 16 L. R. A., 787.

This much, indeed, seems to be conceded, in substance, by the Court of Civil Appeals, which, apparently, rests its decision on the proposition that neither railway company had been guilty of negligence which was the proximate cause of Beaty's injuries.

The measure of the general duty of a railway company to its passengers has been clearly defined, and is not an open question. In International & G. N. Ry. Co. v. Welch, 86 Texas, 203, 40 Am. St., 829, 24 S. W., 390, this court said:

"Our Supreme Court has laid down the correct rule of liability in

Railway Co. v. Halloren, 53 Texas, 53 [37 Am. Rep., 744], in which it is said: 'Railroad companies, however, are not insurers of the safety of their passengers further than could be required by the exercise of such a high degree of foresight as to possible dangers, and s̈ a high degree of prudence in guarding against them, as would b(us d by very cautious, prudent, and competent persons under similar circumstances.' This rule of liability is sustained by the best text writers and nearly all the adjudicated cases," citing numerous authorities, including both decisions and text-books. The following, also, are excerpts from that case:

"In the case of Levy v. Campbell, 19 S. W., 438, the court approved a charge that the carrier is bound to use the 'utmost practical care in providing for the safety of passengers'; and in Gallagher v. Bowie, 66 Texas, 265 [17 S. W., 407], this court approved a charge that the carrier is bound to use the 'utmost care' to provide for the safety of passengers. In the case of Railway Co. v. Worthington, 21 Md., 288 [83 Am. Dec., 578], the term utmost care is defined to mean 'all the care and diligence possible in the nature of the case.' " . . . In the nature of things the law must leave it to the juries in the exercise of a sound judgment, from their knowledge of men and the ordinary course of human affairs, to determine whether or not a carrier of passengers has exercised the degree of care required by law, and for that reason the charge should be such as to give the best direction to their investigation. It is within the power of railway corporations to secure prudent and competent persons to perform the service necessary in carrying passengers; they can provide the methods which have been tested and found practically valuable for securing immunity from danger; they have the means of enforcing the use of these methods and the exercise of this high degree of care. This the law wisely and justly requires, and the requirement should be rigidly enforced."

I think the rule so announced is both sound and applicable to the facts of the case at bar. See, also, Gulf, C. & S. F. Ry. Co. v. Shields, 9 Texas Civ. App., 652, 28 S. W., 709, in which the rule, as so stated, was applied by said Court of Civil Appeals. Doubtless that court still recognizes, in principle, the correctness of that measure of liability, although, as it seems to me, it failed to apply it properly in this case.

As to proximate cause: In Gulf, C. & S. F. Ry. Co. v. Hayter, 93 Texas, 239, 47 L. R. A., 325, 77 Am. St., 856, 54 S. W., 944, our Supreme Court, through Gaines, C. J., said: "This court has announced the doctrine that, in order to constitute negligence, the act or omission must be the proximate cause of an injury which, in the light of the attending circumstances, ought to have been foreseen as a natural and probable consequence of such act or omission. Railway Co. v. Bigham, 90 Texas, 223, 38 S. W., 162. . . . In our opinion, as a general rule, these questions should be left to the determination of the jury," citing cases.

What constitutes proximate cause, is, ordinarily, not a question of

law, but a question of fact for the jury, to be determined in view of all the surrounding circumstances. The Supreme Court of the United States in Milwaukee & St. P. R. Co. v. Kellogg, 94 U. S., 469, 24 L. Ed., 256, an action for compensation for the destruction of a sawmill and lumber by fire communicated from a burning elevator which had been set on fire from defendant's steamboat, said:

"The true rule is, that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it. The primary cause may be the proximate cause of a disaster, though it may operate through successive instruments, as an article at the end of a chain may be moved by a force applied to the other end, that force being the proximate cause of the movement, or as in the oft cited case of the squib thrown in the market place. 2 Bl. Rep., 892. The question always is, was there an unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? It is admitted that the rule is difficult of application. But it is generally held, that, in order to warrant a finding that negligence, or an act not amounting to wanton wrong, is the proximate cause of an injury, it must appear that the injury was the natural and probable consequence of the negligence or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances. These circumstances, in a case like the present, are the strength and direction of the wind, the combustible character of the elevator, its great height, and the proximity and combustible nature of the sawmill and the piles of lumber. Most of these circumstances were ignored in the request for instruction to the jury. Yet it is obvious that the immediate and inseparable consequences of negligently firing the elevator would have been very different if the wind had been less, if the elevator had been a low building constructed of stone, if the season had been wet, or if the lumber and the mill had been less combustible. And the defendants might well have anticipated or regarded the probable consequences of their negligence as much more far-reaching than would have been natural or probable in other circumstances. We do not say that even the natural and probable consequences of a wrongful act or omission are in all cases to be chargeable to the misfeasance or nonfeasance. They are not when there is a sufficient and independent cause operating between the wrong and the injury. In such a case the resort of the sufferer must be to the originator of the intermediate cause. But when there is no intermediate efficient cause, the original wrong must be considered as reaching to the effect, and proximate to it. The inquiry must, therefore, always be whether there was any intermediate cause disconnected from the primary fault, and self-operating, which produced the injury. Here lies the difficulty. But the inquiry must be answered in accordance with common understanding. In a succession of depend-

ent events an interval may always be seen by an acute mind between a cause and its effect, though it may be so imperceptible as to be overlooked by a common mind. Thus, if a building be set on fire by negligence, and an adjoining building be destroyed without any negligence of the occupants of the first, no one would doubt that the destruction of the second was due to the negligence that caused the burning of the first. Yet in truth, in a very legitimate sense, the immediate cause of the burning of the second was the burning of the first. The same might be said of the burning of the furniture in the first. Such refinements are too minute for rules of social conduct. In the nature of things, there is in every transaction a succession of events, more or less dependent upon those preceding, and it is the province of a jury to look at this succession of events or facts, and ascertain whether they are naturally and probably connected with each other by a continuous sequence, or are dissevered by new and independent agencies, and this must be determined in view of the circumstances existing at the time.

"If we are not mistaken in these opinions, the Circuit Court was correct in refusing to affirm the defendants' proposition, and in submitting to the jury to find whether the burning of the mill and lumber was a result naturally and reasonably to be expected from the burning of the elevator, under the circumstances, and whether it was the result of the continued influence or effect of the sparks from the boat, without the aid or concurrence of other causes not reasonably to have been expected."

As to concurring negligence, an eminent writer states the rule thus: "The mere fact that another person concurs or co-operates in producing the injury or contributes thereto, in any degree, whether large or small, is of no importance." Street's Shearm. & Redf. on Neg., 6th ed., secs. 31, 35, 122n. citing cases. See, also, Thomp., Neg., sec. 75; Bish., Noncont. Law, sec. 39; Newcomb v. New York, C. & H. R. Ry. Co., 169 Mo., 409, 69 S. W., 348; Moon v. Northern P. R. Co., 46 Minn., 106, 48 N. W., 679, 24 Am. St. Rep., 194; Hawkins v. Missouri Pac. Ry. Co., 182 Mo. App., 323, 170 S. W., 461; Asher v. City of Independence, 177 Mo. App., 1, 163 S. W., 574.

As applicable to the issues presented, I quote as follows, from an opinion by Cobb, J., in Southern Ry. Co. v. Webb, 116 Ga., 152, 42 S. E., 395, 59 L. R. A., 109:

"As was said by Elbert, J., in Pullman Palace Car Co. v. Barker, 4 Colo., 344, 34 Am. Rep., 89: 'What is the proximate cause of an injury in a legal sense is often an embarrassing question, involved in metaphysical distinctions and subtleties difficult of satisfactory application in the varied and practical affairs of life.' Chief Justice Shaw, in Marble v. Worcester, 4 Gray, 397, said: 'The whole doctrine of causation, considered in itself metaphysically, is of profound difficulty, even if it may not be said, of mystery.' In Scott v. Hunter, 46 Pa., 195, 84 Am. Dec., 542, Strong, J., said: 'Indeed, it is impossible, by any general rule, to draw a line between those injurious causes of damage which the law regards as sufficiently proximate and those which are too

remote to be the foundation of an action.' In Smith v. Western U. Teleg. Co., 83 Ky., 114, Judge Holt remarked: 'The line between proximate and remote damages is exceedingly shadowy; so much so that the one fades away into the other, rendering it often very difficult to determine whether there is such a connection between the wrong alleged and the resulting injury as to place them, in contemplation of law, in the relation of cause and effect.' It has been said that, notwithstanding the maze of doubt and difficulty with which this subject seems to be involved, still it is possible to take a more practical and simple view than the observations of learned jurists would indicate; that the practical administration of justice prefers to disregard the intricacies of metaphysical distinctions and subtleties of causation, and to hold that the·inquiry as to natural and proximate cause and consequence is to be answered in accordance with common sense and common understanding. Watson, Damages for Personal Injuries, sec. 28. From the author just cited we quote the following: 'A natural consequence is one which has followed from the original act complained of in the usual, ordinary, and experienced course of events; a result, therefore. which might reasonably have been anticipated or expected. Natural consequences, however, do not necessarily include all such as extreme prudence might anticipate but only those which ensue from the original act, without any such extraordinary coincidence or conjunction of circumstances as that the usual course of nature should seem to have been departed from.' Sec. 33. 'From the very outset the practical distinction between causes and consequences should be borne in mind in this particular; a consequence of an original cause may, in turn, become the cause of succeeding consequences. But such a cause should not, manifestly, be regarded as an intervening cause, which will relieve from liability the author of the original cause, but rather as only a consequence along with the other consequences. A tortious act may have several consequences, concurrent or successive, for all of which the first tort feasor is responsible. It is not intervening consequences, but intervening causes, which relieve. The test is to be found, it has been said, not in the number of intervening events or agents, but in their character, and in the natural and probable connection between the wrong done and the injurious consequence. So long as it affirmatively appears that the mischief is attributable to the original wrong as a result which might reasonably have been foreseen as probable, legal liability continues.' Sec. 58. 'Some authorities have formulated rules on this subject designed for general application,—as that the defendant is not responsible where there has intervened the wilful wrong of a third person, or is liable where such act is of a negligent character merely. But the better doctrine is believed to be that whether or not the intervening act of a third person will render the earlier act too remote depends simply upon whether the concurrence of such intervening act might reasonably have been anticipated by the defendant.' Sec. 71. In Pittsburg Southern R. Co. v. Taylor, 104 Pa., 315, 49 Am. Rep., 580, Mr. Justice Paxson said: 'In determining what is proximate cause the true

rule is that the injury must be the natural and probable consequence of the negligence; such a consequence as, under the surrounding circumstances of the case, might and ought to have been foreseen by the wrongdoer as likely to flow from his act.' In Lane v. Atlantic Works, 111 Mass., 139, Colt, J., said: 'The injury must be the direct result of the misconduct charged; but it will not be considered too remote if, according to the usual experience of mankind, the result ought to have been apprehended. The act of a third person, intervening and contributing a condition necessary to the injurious effect of the original negligence, will not excuse the first wrongdoer, if such act ought to have been foreseen. The original negligence still remains a culpable and direct cause of the injury. The test is to be found in the probable injurious consequences which were to be anticipated, not in the number of subsequent events and agencies which might arise.' In Seale v. Gulf, C. & S. F. R. Co., 65 Texas, 278, 57 Am. Rep., 602, Chief Justice Willie said: 'What character of intervening act will break the causal connection between the original wrongful act and the subsequent injury is also left in doubt by the decisions. If the intervening cause and its probable or reasonable consequences be such as could reasonably have been anticipated by the original wrongdoer, the current of authority seems to be that the connection is not broken.' See, also, Colorado Mortg. & Invest. Co. v. Rees, 21 Colo., 435, 42 Pac., 42, 45; 21 Am. & Eng. Ency. of Law, 2d ed., pp. 486 et seq."

Several of the cases cited by the Court of Civil Appeals are distinguishable from this case on the facts.

In Gulf, C. & S. F. Ry. Co. v. Wallen, 65 Texas, 568, this court said:

"It does not appear from the testimony that a single one of those who leaped from the train, except the plaintiff, saw the freight train coming. When the plaintiff saw it, it was three or four hundred yards away, and as he says, appeared to be moving rapidly. He does not state that he supposed from what he saw that there would be a collision. No one left the train upon his own perception of danger. On the contrary, those who used their own senses felt no alarm, and remained in the cars."

However, the principle upon which I insist is plainly recognized in the opening sentence of the opinion in the Wallen case, as follows:

"The defendant neither caused nor contributed to the injury of plaintiff's wife, unless it allowed the freight train to come so near to or so rapidly towards the passenger coach as to frighten the passengers."

In Dillingham v. Pierce, 31 S. W., 207, and in Texas & P. Ry. Co. v. Urteaga, 25 S. W., 1035, the facts were dissimilar from those here involved.

Essentially different from the facts of this case are those detailed in the opinion by Sherwood, J., in McPeak v. Missouri Pac. Ry. Co., 128 Mo., 617, 30 S. W., 170, wherein it was said:

"It is disclosed by undisputed evidence that there was no real danger, and no object within the range of vision from which danger could be apprehended, as both the advance and rear trains were out of sight.

Plaintiff was guilty of the grossest contributory negligence, and even recklessness, in taking no precaution by looking out of the windows, or otherwise, before running out of the caboose and jumping off a train going at the rate of fifteen miles an hour, in the opposite direction from which he jumped."

But even that opinion adds this:

"The rule in such cases is thus laid down by the Court of Appeals of Kentucky. '. . . He, however, must act upon a reasonable apprehension of peril. His conduct must conform to that of an ordinarily careful man under like circumstances,'" citing Jones v. Boyce, 1 Starkie, 493; South Covington & C. St. Ry. Co. v. Ware, 84 Ky., 267, 1 S. W., 493, and other cases.

In Chicago, R. I. & P. Ry. Co. v. Felton, 125 Ill., 458, 17 N. E., 765, the decision turned upon the fact that the evidence failed to show that the blowing of the whistles, upon which plaintiff predicated his charge of negligence, was in fact negligent; wherefore, it was held that the giving of a charge which assumed that such blowing of the whistles was negligence was reversible error. In the opinion therein I find nothing which conflicts with my own views as herein stated, but much in support thereof.

Applying such of the foregoing legal principles as I consider applicable to this case, I think that the location, course and proximity of the railway tracks, the relative positions in which the two trains were being moved, the excessive and illegal rate of speed at which each of them was being run within the city and the blowing of the whistle upon one of them, may all be considered as circumstances, along with other existing facts and circumstances, from which to determine (1) whether or not the plainly established concurring negligence of each of the railway companies, in running its train at such illegal speed, was or was not the proximate cause of Beaty's injuries, and (2) whether they created such an appearance of actual danger to him as would relieve his act of jumping from the aspect of contributory negligence; and that, upon the whole, the evidence was such as to require that those issues be submitted to the jury for determination.

Aside from the merits of this case, I deem it proper to say, there exists, in my mind, some question as to whether plaintiff in error is in position here to complain of the trial court's failure to submit this case to the jury, there being, it seems, nothing in the record to show that seasonable and proper objection was made to the giving of the peremptory instruction against him. See Acts 1913, p. 113. However, I pretermit discussion of that question because (a) it did not enter into or control the action of this court in this case, and (b) the point is receiving, in another cause, the careful consideration of this entire court. My conclusion, otherwise, is that the motion for rehearing and also the petition for writ of error should be granted.